IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| DIXON LUMBER COMPANY, INCORPORATED, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 7:16-cv-00130 |
| AUSTINVILLE LIMESTONE COMPANY, INC., | ) ) ) | By: Elizabeth K. Dillon United States District Judge |
| Defendant. | ) ) | |

**MEMORANDUM OPINION**

Plaintiff Dixon Lumber Company and defendant Austinville Limestone Company (ALC) own adjacent plots of land in Wythe County, Virginia. Dixon's property is called "Austin Meadows," and the court will refer to ALC's as "the Austinville site." Both companies bought their property from Gulf & Western Industries (G&W), which operated a zinc and lead mine on the Austinville site through a division called New Jersey Zinc Company (NJZ). Years before ALC and Dixon purchased their properties, NJZ dumped limestone tailings, a byproduct of its mining operations, on Austin Meadows. Dixon now seeks to hold ALC responsible for environmental liabilities arising from those limestone tailings under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9675.

Before the court are Dixon and ALC's cross-motions for partial summary judgment on the issue of whether ALC is a corporate successor of G&W. (Dkt. Nos. 49, 51.) Both motions have been fully briefed and argued and are now ripe for disposition. For the reasons stated below, the court finds that ALC is not G&W's corporate successor and will therefore grant

ALC's motion and deny Dixon's.

## I.  BACKGROUND

The Austinville site has been mined, more or less continuously, since the mid-eighteenth century.  NJZ bought the mine in 1902 and, at some point, was acquired by and became a part of G&W.[1]  It is undisputed that NJZ was a division of G&W at all times relevant to Dixon and ALC's motions.

Until 1981, NJZ extracted dolomitic limestone containing zinc and lead ore from an underground mine on the Austinville site.  The mine was made up of a 1200-foot mine shaft with perpendicular levels every 100 to 200 feet.  Miners would drill into the limestone on the various rock levels, use gun powder to blast the rock loose, and then use shovels, front end loaders, and electric-powered railcars to transport the rock to an underground "jaw crusher" at the base of the mine shaft.  Once crushed by the jaw crusher, the rocks would be hoisted out of the mine to be processed and milled.

The limestone rocks that came out of the mine were of two kinds.  Some rocks, called "deads," contained no zinc or lead ore.  Those rocks were crushed and sold as gravel or agricultural rock.  The other rocks (those with lead and zinc in them) were sent through what the parties call a "wet flotation process" to extract the ore.  First, the rocks would be sent through a series of crushers, rod mills, and ball mills, until they were reduced to a fine, powdery substance.  That substance would be mixed with water and piped into flotation chambers.  Chemicals would then be added to the resulting slurry that would cause the zinc and lead to float to the top, where it could be skimmed off.  Once the zinc and lead had been removed from the chemical slurry, the remaining limestone particles, called "fines" or "tailings," were piped elsewhere on NJZ's

---

[1] Dixon asserts that NJZ merged with G&W in the 1960's, but provides no citation for this claim.  (Pl.'s Mot. Summ. J. ¶ 9.)

property. Tailings that were sufficiently coarse to be saleable, called "coarse" tailings or "new lime," were sold as agricultural limestone, and NJZ stockpiled them near the plant where they could be loaded onto railcars and trucks. The remaining tailings—*i.e.*, those that were too fine to be sold—were a waste product for NJZ, and NJZ dumped them in hollows and valleys throughout the property for storage. At some point, NJZ disposed of these waste fines on Austin Meadows, resulting in the tailings pile at issue in this case.[2] NJZ also dumped tailings on a location on the Austinville site called Bunker Hill.

During the course of its operations, NJZ acquired certain environmental obligations, reflected by an NPDES permit and a no-discharge certificate. The permit, NPDES Permit No. VA 0000272, authorized, and required NJZ to monitor, discharges from several outfalls on the Austinville site. No-Discharge Certificate No. IW-ND-1026 forbade discharges to state waters from Austin Meadows, and required NJZ to regrade and revegetate that location.

In fall 1981, G&W announced its intent to close NJZ's mining operations on the Austinville site. By the end of that year, G&W had closed the underground mine, terminated the majority of NJZ's employees, and largely ceased operations on the site. Once the mine was closed, NJZ no longer produced zinc and lead; however, it continued to sell agricultural limestone from the existing stockpiles. NJZ retained an employee to operate the scales for weighing the limestone, and continued to utilize the same contractor to operate the heavy machinery associated with loading it.

---

[2] It is not clear exactly when NJZ dumped the tailings on Austin Meadows. Robert Reynolds, who held a variety of positions for NJZ between 1962 and 1981, stated in his deposition that NJZ dumped tailings on Austin Meadows while he worked there. (Reynolds Dep. 32, Dkt. No. 50-3.) Douglas Akers, who worked for NJZ from 1964 to 1981, stated that he did not know of any tailings being dumped on Austin Meadows while he worked for NJZ and that the tailings on Austin Meadows were placed there before he began working for NJZ. (Akers Dep. 30–31, Dkt. No. 50-1.) Similarly, Roger Parnell, who worked for NJZ from 1973 to 1981, testified that fines were only sent to Bunker Hill while he worked there. (Parnell Dep. 13, Dkt. No. 50-2.) Finally, the preliminary engineering report sent to the DEQ on October 12, 1993, indicates that Austin Meadows had been inactive since the early 1970's. (Def.'s Ex. A at 1061.)

Around the time that G&W announced its decision to close the Austinville mine, James River Limestone Company (JRLC), a well-established Virginia producer of limestone products, contacted G&W and informed it that JRLC might be interested in purchasing the property if agricultural limestone was available in the area. On October 23, 1981, after several meetings between JRLC and G&W representatives, and a visit by JRLC representatives to the Austinville site, JRLC offered to purchase some of G&W's assets associated with NJZ's Austinville mining operations. G&W and JRLC communicated periodically throughout the end of 1981 and the following year. In some of its letters to G&W, JRLC stated that it would have to consider possible reclamation costs and environmental liabilities in its asset purchase.

On October 25, 1982, JRLC and G&W executed an Agreement for the Purchase of Assets (the Purchase Agreement) (Purchase Agreement ¶ 7, Dkt. No. 50-6), which JRLC promptly assigned to ALC, a subsidiary it created to operate the Austinville site.[3] Among other things, ALC agreed to purchase, for $600,000: (1) the parcel of real property on which G&W operated the mine (*i.e.*, the Austinville site); (2) all tangible property except items that G&W could use in other mines, which were identified in an appendix to the agreement; and (3) the stockpiles of "new" agricultural limestone on the site. (Purchase Agreement ¶¶ 1–3.) The agreement also contemplated the transfer of certain environmental and reclamation licenses and authorizations to ALC. (*Id.* ¶ 5.) The precise terms of the Purchase Agreement are discussed in section II.C.1, below.

The day the agreement was signed, NJZ and ALC sent a joint letter to the State Water Control Board to inform the Board that the property had been transferred and that ALC was

---

[3] The defendant in this action is actually a successor to the original ALC. In 1996, several JRLC employees purchased ALC and continued its operations under the same name. There is no dispute that the current ALC is a continuation of the JRLC subsidiary, and the court will refer to the two companies interchangeably as ALC for convenience. Where necessary to distinguish between the two companies, the court will refer to the JRLC subsidiary as ALC I and the current company as ALC II.

assuming responsibility for compliance with NPDES Permit No. VA 0000272. Specifically, NJZ and ALC informed the Board that the transferred property encompassed four of six discharges covered by the existing NPDES permit and noted that three of the four had been eliminated as a result of the mine shutdown. The letter indicated that ALC would assume responsibility for the discharges on the transferred property starting October 25, 1982. Ultimately, the State Water Control Board issued ALC a new permit, No. VA 0058424, instead of transferring No. VA 0000272.

After ALC purchased the Austinville site, it began its operations by selling agricultural limestone from the existing stockpiles, which it blended with NJZ's waste piles of fines on the site. Planning to begin its own permanent mining operations before the stockpiles of agricultural limestone were depleted, ALC also began tearing out the equipment that NJZ used for its wet flotation process in order to install its own equipment. ALC tore out NJZ's rod and ball mills and replaced them with different kinds of crushers, called "Bradley presses," for its mining operations. ALC also installed conveyer belts and bucket elevators to replace the pipes that NJZ used to transport the lime, and installed shaker screens to separate the lime from larger particles. After it installed the new equipment, ALC operated what the parties refer to as a "dry" mining process. ALC never reopened the underground NJZ mine, or sold zinc or lead; instead, it extracted dolomitic limestone from an open-faced quarry. This work was originally done by an independent contractor, but was taken over by ALC within a year or two. Limestone that ALC extracted from the quarry was sent through newly installed Bradley presses, which crushed it down for sale—ALC did not use any sort of flotation process. Eventually, ALC installed a bagging operation in order to sell agricultural limestone in smaller quantities and began selling pelletized limestone as well.

In November 1984, Dixon purchased 2,071 acres of land from G&W, which included Austin Meadows.  Dixon paid $800,000 for that land.  Dixon represents that it was unaware of the tailings pile on Austin Meadows at the time of the purchase and did not contractually assume any environmental permitting or compliance obligations with respect to the property.  Dixon learned about the tailings pile in 1992 when it received a letter from the State Water Control Board informing it that the drainage system under Austin Meadows had begun to fail and that high amounts of zinc and lead had been found in the New River, supposedly emanating from the tailings pile. The same year, Dixon entered into a consent agreement with the Department of Environmental Quality (DEQ) to remove the tailings pile from Austin Meadows and reclaim the property by 1999.  That consent order authorized Dixon to contract with ALC to remove the limestone tailings.  A series of amended consent orders extended the term of the order until 2015.

 Pursuant to the consent orders, Dixon and ALC entered into a series of agreements regarding the removal of the limestone tailings.  The original agreement, made in 1993, authorized ALC to remove the tailings pile on Austin Meadows and provided that its operations would be considered remedial actions on behalf of Dixon.  Subsequent agreements in 2003 and 2008 extended the timeline for ALC's tailings removal activities and provided that Dixon would receive a royalty for tailings removed, processed, and sold by ALC.

Following a heavy rainfall and discharge of pollutants in June 2013, DEQ and the Department of Mines, Minerals and Energy (DMME) entered into a letter of agreement with Dixon and ALC.  Among other things, that letter required Dixon and ALC to develop a final plan for reclamation of Austin Meadows and to submit it to DEQ/DMME.  While developing that plan, Dixon and ALC hit an impasse on which party would be responsible for final reclamation costs on the Austin Meadows site.  Dixon subsequently filed this suit, claiming that ALC, as

NJZ's corporate successor, is liable for at least some of the costs of reclaiming Austin Meadows.

## II.    DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]hen a court considers a summary judgment motion, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (en banc) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). When considering cross-motions for summary judgment, the court must "consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Defs. of Wildlife v. N.C. DOT*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Bacon v. City of Richmond, Va.*, 475 F.3d 633, 638 (4th Cir. 2007)).

### B.  Dixon's Procedural Challenges

Before discussing the substance of Dixon and ALC's motions for summary judgment, the court will address several procedural challenges that Dixon raised in opposition to ALC's motion. Dixon makes three procedural arguments: (1) that ALC's motion should be denied because it did not include a separately-captioned statement of facts as required by Local Civil Rule 56(b); (2) that some of ALC's arguments about NJZ's and ALC's histories and operations are improper because they contradict the testimony of ALC's corporate designee; and (3) that the deposition testimony of three fact witnesses must be excluded because ALC did not disclose those witnesses as required by Federal Rule of Civil Procedure 26. The court will address these contentions in turn.

### 1. ALC's failure to include a separately-captioned statement of facts

Under this court's Local Civil Rule 56, a motion for summary judgment must include "a separately captioned section setting forth with specificity the material facts claimed to be undisputed together with specific record citations thereof." W.D. Va. Civ. R. 56(b). Although ALC's brief included a cited introduction section and citations for ALC's factual claims throughout, it did not include a separate statement of facts. After Dixon noted this defect in its opposition brief, ALC promptly moved for leave to file a supplemental statement of facts that listed the factual statements of its brief in a properly-captioned section without changes to citation or wording. (Dkt. No. 56.) The court granted that motion and gave Dixon the opportunity to respond. (Dkt. No. 61; Dkt. No. 65.) Dixon, in turn, filed specific objections to all 50 numbered paragraphs of ALC's supplemental statement of facts. Nevertheless, Dixon argues that the court should deny ALC's motion for summary judgment for failure to comply with Local Civil Rule 56.

Although ALC's brief violated Local Rule 56(b), the court will exercise its discretion to overlook that violation here. *See, e.g.*, *Simmons v. Navajo Cty.*, 609 F.3d 1011, 1017 (9th Cir. 2010) (noting that "[d]istrict courts have broad discretion in interpreting and applying their own rules") (quoting *Miranda v. S. Pac. Transp. Co.*, 710 F.2d 516, 521 (9th Cir. 1983)); *Ass'n for Retarded Citizens v. Thorne*, 68 F.3d 547, 553–54 (2d Cir. 1995); *El-Kaissi v. Martinaire, Inc.*, No. 03-cv-132, 2005 U.S. Dist. LEXIS 43417, at *6–9 (S.D. Tex. Nov. 3, 2005) (collecting cases suggesting that district courts have discretion to decide whether to overlook violations of their local rules). The purpose of Local Civil Rule 56(b) is to ensure that a party filing for summary judgment provides notice of the purportedly undisputed material facts, so that both the court and the opposing party can gauge whether summary judgment is appropriate. There is no indication

that ALC's failure to include a facts section was an attempt to mislead the court as to the undisputed facts; indeed, all of the facts from its later-filed supplement were included verbatim in its original brief. So, although Dixon did not have the benefit of that section when responding to ALC's motion, it had notice of ALC's factual contentions and was able to address them in its opposition brief. Moreover, the court will consider both ALC's factual supplement and Dixon's objections thereto in resolving ALC's motion. Since ALC's initial non-compliance with Local Civil Rule 56(b) did not meaningfully affect Dixon's ability to respond to its motion or this court's ability to resolve it, the court rejects Dixon's argument.

### 2. Dixon's claim that ALC's motion contradicts the testimony of its corporate designee

Next, Dixon claims that ALC's motion for summary judgment should be denied because portions of it contradict the testimony of Kevin Mann, ALC's President and corporate designee. Specifically, Dixon claims that, in his Rule 30(b)(6) deposition, Mann denied knowledge of: (1) NJZ and G&W's corporate histories and operations on the Austinville site; (2) the corporate history of ALC I from 1910 to 1996; and (3) the equipment transferred from NJZ to JRLC. But ALC's motion for summary judgment, and particularly its argument that ALC is not a continuation of G&W, compares the operations of NJZ and ALC I before and immediately after the 1982 purchase agreement. Since Mann denied that ALC had knowledge of those operations in his deposition, Dixon argues, ALC cannot assert that it has that knowledge now.

A Rule 30(b)(6) designee "speaks for the corporation," *Grottoes Pallet Co. v. Graham Packaging Plastic Prods., Inc.*, No. 5:15-cv-17, 2016 U.S. Dist. LEXIS 1459, at *13 n.3 (W.D. Va. Jan. 6, 2016), and "must testify about information known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6). By requiring a corporate designee to testify about information "reasonably available to the organization," *id.*, Rule 30(b)(6) is meant to "curb the

'bandying' by which officers or managing agents of a corporation are deposed in turn but each disclaims knowledge of facts that are clearly known to persons in the organization and thereby to it." Fed. R. Civ. P. 30(b)(6) advisory committee's notes to 1970 amendment.  Consistent with that purpose, courts have declined to consider subsequent affidavits from an organization that contradict the testimony of its Rule 30(b)(6) designee, *e.g., Caraustar Indus. v. N. Ga. Converting, Inc.*, No. 3:04-cv-187, 2006 U.S. Dist.  LEXIS 91829, at *19–22 (W.D.N.C. Dec. 19, 2006), or that assert knowledge of a subject about which the designee claimed ignorance. *Dorsey v. TGT Consulting, LLC*, 888 F. Supp. 2d 670, 685 (D. Md. 2012) ("[D]epending on the 'nature and extent of the obfuscation, the testimony given by [a] non-responsive deponent (e.g., 'I don't know') may be deemed 'binding on the corporation' so as to prohibit it from offering contrary evidence at trial.'") (quoting *Wilson v. Lakner, M.D.*, 228 F.R.D. 524, 530 (D. Md. 2005)); *Rainey v. Am. Forest & Paper Ass'n*, 26 F. Supp. 2d 82, 94–95 (D.D.C. 1998).  To comply with Rule 30(b)(6), a corporation must put forth a thorough, good faith effort to prepare its designee to give binding answers on its behalf.  *Rainey*, 26 F. Supp. 2d at 94.

However, Rule 30(b)(6) does not require the court to exclude evidence that contradicts a corporate designee's deposition testimony in all situations.  Mindful of the fact that it is "often impossible in any enterprise where employees have distinct roles for there to be one person who can answer all questions posed during a 30(b)(6) deposition," *Weinstein v. D.C. Hous. Auth.*, 931 F. Supp. 2d 178, 186 (D.D.C. 2013) (quoting *Covad Commc'ns. Co. v. Revonet, Inc.*, 267 F.R.D. 14, 25 (D.D.C. 2010)), courts generally exclude subsequent affidavits only to prevent the kind of "bandying" that Rule 30(b)(6) is meant to avoid—that is, situations where a company seeks to subvert the discovery process by denying knowledge of clearly available information in its deposition and then ambushing the opposing party after the close of discovery.  *See Weinstein*,

931 F. Supp. 2d at 185 (noting that good faith ignorance "should not lead to' reprimand or similar consequences, as these 'should be reserved for' instances where a corporation's officers or managing agents are deposed but 'disclaim knowledge of the facts that are clearly known to the organization.'") (quoting *Covad Commc'ns.*, 267 F.R.D. at 26) (alterations omitted); *Dorsey*, 888 F. Supp. 2d at 685–86 (declining to exclude affidavits where the designee's testimony "[did] not rise to the level of obfuscation or suggest some effort by the [company] to ambush the plaintiffs or abuse the discovery process"); *Caraustar*, No. 3:04-cv-187, 2006 U.S. Dist. LEXIS 91829, at *21–22.

The court finds no basis in Rule 30 for excluding ALC's evidence here. As an initial matter, it is not clear that Mann denied knowledge of ALC's past operations to the extent that Dixon suggests. While Mann certainly denied *personal* knowledge of ALC I's operations and employees from 1982, he stated that he could testify about those matters to the extent he had seen documents or had discussions with individuals who knew about them.[4] (Mann Dep. 55:4–24, Dkt. No. 59-1.) Since Mann was not required to have personal knowledge of the relevant facts to testify as ALC's corporate designee, *Weinstein*, 931 F. Supp. 2d at 185, the fact that he denied personal knowledge does not imply that he violated his obligations under Rule 30(b)(6). And although Dixon suggests that Mann's preparation was inadequate, Mann testified that he reviewed all of the documents produced in discovery and observed the depositions of former employees of NJZ and ALC I. It is therefore not apparent to the court that Mann's preparation was insufficient.

But in any event, there is simply no indication that ALC attempted to manipulate the

---

[4] Mann did deny knowledge of NJZ and G&W's operations and corporate history on the Austinville site. But 70 years of corporate structure and history of a different company, which ceased most of its operations on the Austinville site nearly a year before JRLC purchased it and over fourteen years before ALC II began operations, is not the sort of information that would be "reasonably available" to ALC II. Fed. R. Civ. P. 30(b)(6).

discovery process or otherwise engaged in the kind of "bandying" that Rule 30(b)(6) prohibits.

Importantly, Dixon does not claim that ALC submitted contradictory affidavits asserting

knowledge of things Mann claimed not to know—it claims that ALC violated Rule 30(b)(6) by

relying on other evidence of NJZ and ALC I's operations to argue about those facts. Nothing in

Rule 30(b)(6) suggests that a company that denies knowledge of a fact cannot produce evidence

of that fact from another source. *See, e.g.*, *Banker Steel Co., LLC v. Hercules Bolt Co.*, No. 6:10-

cv-5, 2011 U.S. Dist. LEXIS 49761, at *52 (W.D. Va. May 6, 2011); *Interstate Narrow Fabrics,

Inc. v. Century USA, Inc.*, 218 F.R.D. 455, 462 (M.D.N.C. 2003) (noting that "statements in a

30(b)(6) deposition are not the same as judicial admissions, [and] that under certain

circumstances the corporation may contradict the testimony at trial"). Nor does doing so

prejudice the opposing party or subvert the discovery process. That is particularly clear here,

since the bulk of ALC's continuity of enterprise argument relies on the testimony of former NJZ

employees who were deposed before Mann, and on whose testimony Dixon itself relies

extensively. Since this is clearly not the kind of situation that Rule 30(b)(6) was meant to

prevent, the court rejects Dixon's argument.

### 3. Dixon's claim that ALC failed to disclose witnesses

Finally, Dixon argues that ALC cannot rely on the testimony of Roger Parnell, Robert

Reynolds, and Douglas Akers—three former NJZ and ALC employees—because those witnesses

were not identified in ALC's Rule 26 disclosure and because ALC never supplemented its

disclosure in order to add them. Rule 26 requires a party to supplement its Rule 26(a) witness

disclosure "in a timely manner if the party learns that in some material respect the disclosure . . .

is incomplete or incorrect, and if the additional or corrective information has not otherwise been

made known to the other parties during the discovery process or in writing . . . ." Fed. R. Civ. P.

26(e)(1).  If a party fails to supplement its disclosures as required by Rule 26(e), the court may exclude the undisclosed information for purposes of a motion for summary judgment "unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

Assuming that ALC's identification of Parnell, Roberts, and Akers as ALC employees in its interrogatory responses and deposition notices was insufficient to "otherwise [make them] known" to Dixon as required by Rule 26, that failure was clearly harmless.  Since Dixon identified Akers as a person likely to have knowledge of ALC's operations in its own initial disclosures, it was obviously aware from the beginning that he had discoverable information. *See Piburn v. Black Hawk-Grundy Mental Health Ctr., Inc.*, No. 15-cv-2045, 2016 U.S. Dist. LEXIS 114493, at *12–14 (N.D. Iowa Aug. 24, 2016); *El Camino Res, Ltd. v. Huntington Nat'l Bank*, No. 1:07-cv-598, 2009 U.S. Dist. LEXIS 36704, at *14–15 (W.D. Mich. Apr. 30, 2009), *R. & R. adopted*, 722 F. Supp. 2d 875.  Moreover, since Dixon deposed all three witnesses and relies extensively on their deposition testimony in support of its own motion for summary judgment (*see generally* Dkt. No. 51), ALC's reliance on this same evidence could not have surprised or otherwise prejudiced Dixon.  *See S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596–97 (4th Cir. 2003) (articulating the factors to consider when deciding whether nondisclosure is harmless and noting that the basic purpose of Rule 37(c)(1) is to prevent surprise and prejudice to the opposing party).  Thus the court will not exclude those witnesses when considering ALC's motion for summary judgment.

## C.  ALC's Corporate Successor Liability

Having rejected Dixon's procedural challenges to ALC's motion for summary judgment, the court now turns to the substantive issue of this case: whether ALC is a successor of G&W for purposes of CERCLA liability.  The Fourth Circuit has recognized that a corporate successor

may be held liable for the actions of its predecessor under CERCLA. *PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 173 (4th Cir. 2013); *United States v. Carolina Transformer Co.*, 978 F.2d 832, 837 (4th Cir. 1992). Since CERCLA is silent on the issue of successor liability, courts determine whether a corporation is a successor by looking to common law. *Carolina Transformer*, 978 F.2d at 837; *Cf. United States v. Bestfoods*, 524 U.S. 51, 63 (1998). Under ordinary principles of common law, a corporation that acquires the assets of another does not acquire its liabilities unless: "'(1) the successor expressly or impliedly agrees to assume the liabilities of the predecessor; (2) the transaction may be considered a de facto merger; (3) the successor may be considered a 'mere continuation' of the predecessor; or (4) the transaction is fraudulent.'" [5] *PCS Nitrogen*, 714 F.3d 161, 173 (quoting *Carolina Transformer Co.*, 978 F.2d at 837).

Dixon does not characterize ALC's purchase of the Austinville site as a de facto merger or claim that the transaction was fraudulent, so the parties focus on the first and third theories of successor liability. Dixon and ALC disagree on three sub-issues: (1) whether ALC explicitly assumed NJZ's environmental liabilities as to Austin Meadows under the Purchase Agreement; (2) whether ALC impliedly assumed those liabilities in a pre-purchase letter to G&W representatives from JRLC and in representations to the State Water Control Board around the time that the Purchase Agreement was executed; and (3) whether ALC is a continuation of G&W's operations on the Austinville site. The court will next address these issues.

### 1. ALC did not expressly assume NJZ's CERCLA liabilities

Whether ALC expressly assumed environmental liability for Austin Meadows under the

---

[5] The parties do not discuss whether state or federal common law controls here. However, since Virginia law limits successor liability to the same situations as those articulated in *PCS Nitrogen*, *see Harris v. T.I., Inc.*, 413 S.E.2d 605, 609 (Va. 1992), the court need not resolve this issue. *See New York v. Nat'l Serv. Indus.*, 460 F.3d 201, 209 (2d Cir. 2006) (Sotomayor, J.) (declining to decide whether CERCLA requires application of federal common law or state law where the court would reach the same conclusion in either case).

1982 Purchase Agreement is a question of contract interpretation. *See PCS Nitrogen*, 714 F.3d at 173 (applying state contract law to determine whether a corporation explicitly assumed CERCLA successor liability). Thus, the court must determine whether the Purchase Agreement allocated environmental responsibilities for Austin Meadows to ALC by applying Virginia's principles of contract interpretation.

When interpreting a contract, the court seeks to determine the parties' intent from the language used. *Providence Square Assocs., L.L.C. v. G.D.F., Inc.*, 211 F.3d 846, 850 (4th Cir. 2000). Thus, "when the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning." *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012) (quoting *Barber v. VistaRMS, Inc.*, 634 S.E.2d 706, 712 (2006)). When construing contract language, the words used should be given "their usual, ordinary, and popular meaning." *Id.* (quoting *City of Chesapeake v. States Self-Insurers Risk Retention Grp., Inc.*, 628 S.E.2d 539, 541 (2006)). Furthermore, contracts must be interpreted holistically, giving meaning to all provisions wherever possible. *Armstrong v. United States*, 7 F. Supp. 2d 758, 766–67 (W.D. Va. 1998); *TravCo*, 736 S.E.2d at 325 ("No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly.") (quoting *City of Chesapeake*, 628 S.E.2d at 541).

Where the terms of a contract are "vague or ambiguous," the court "may consider extrinsic evidence to interpret those provisions." *Providence Square Assocs.*, 211 F.3d at 850. Notably, that the parties' disagree on the proper interpretation of a contract does not necessarily mean that the contract is ambiguous. Contract language is ambiguous only when it is "capable of more than one reasonable meaning," *Marks v. Scottsdale Ins. Co.*, 791 F.3d 448, 452 (4th Cir. 2015) (quoting *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 636 (4th Cir.

2005)), so alternative but unreasonable interpretations of a contract do not preclude summary judgment. *See Foothill Capital Corp. v. E. Coast Bldg. Supply Corp.*, 259 B.R. 840, 846 (E.D. Va. 2001); *Babcock & Wilcox Co. v. Areva NP, Inc.*, 788 S.E.2d 237, 244 (Va. 2016).

Accordingly, the court must determine whether the scope of environmental liabilities transferred to ALC is clear from the plain language of the purchase agreement and, if so, whether those environmental liabilities include responsibility for Austin Meadows. *See Babcock*, 788 S.E.2d at 244. Paragraphs five and nine of the Purchase Agreement, the sections addressing environmental obligations, provide as follows:

> (5) Seller agrees to transfer to Buyer all operating, environmental, reclamation and like governmental permits, licenses, authorizations and bonds in effect as of October 25, 1982, and the parties hereto agree to cooperate with each other in effecting the transfer of all of said permits, licenses, authorizations and bonds. Buyer agrees to comply with all applicable government rules and regulations affecting the purchased premises beginning October 25, 1982.
> . . .
>
> (9) Buyer agrees to maintain the premises covered by this agreement and to conduct its activities thereon in such a manner that Seller shall not, by reason of any act or omission of Buyer, violate any law, rule, regulation, ordinance, standard, license or permit applicable to any land of Seller adjacent to said premises, including, without limitation, the No-Discharge Certificate issued by the Commonwealth of Virginia to Seller in respect of its adjacent land known as Austin Meadows, of which a copy is attached hereto and made a part hereof, marked "Exhibit C."

(Purchase Agreement ¶¶ 5, 9.) Dixon also relies on another provision of the agreement, which was added by a letter amendment dated November 15, 1982:

> (3) All books, records, files, maps and other documents of Seller located on said premises shall remain the property of Seller. Upon removal of such property from said premises, Seller shall notify Buyer of the location of: all such records and maps relating to the said premises; all 1982 water-discharge records included therein; and all records of Seller's hazardous-waste studies of limestone tailings included therein. Buyer shall be afforded reasonable

> access to and opportunity to make copies of such records and maps relating to said premises.

(Am. Purchase Agreement ¶ 3; Dkt. No. 51-19.)

Of course, Dixon and ALC urge different interpretations of this language. Dixon argues that the agreement expressly transfers *all* of NJZ's environmental liabilities to ALC, including NJZ's obligations under No-Discharge Certificate No. IW-ND-1026 to monitor and prevent discharge from Austin Meadows into Buddle Branch and the New River and to regrade and revegetate the tailings pile at that location. ALC, on the other hand, argues that the language of the agreement explicitly limits ALC's assumption of environmental liabilities to those (1) affecting the Austinville site and (2) beginning on the date of transfer.

The court agrees with ALC's interpretation of the Purchase Agreement. On its face, paragraph five indicates that ALC intended to assume responsibility only for certain kinds of environmental obligations: those "affecting the purchased premises"—*i.e.*, the Austinville site— and "beginning on October 25, 1982." (Purchase Agreement ¶ 5.) While that would apparently include the responsibility to monitor discharges from the outfalls listed in NPDES Permit No. VA 0000272 that were located on the Austinville site, it would not include the No-Discharge Certificate, which affected only Austin Meadows. Accordingly, paragraph five does not suggest that ALC assumed CERCLA liabilities for Austin Meadows in the Purchase Agreement.

Paragraph nine confirms that conclusion. That paragraph requires ALC to operate and maintain the Austinville site in such a way that it would not cause NJZ to violate its own obligations as to adjacent land, including its obligations under the No-Discharge Certificate. The clear meaning of this paragraph is that ALC did not assume responsibility for the No-Discharge Certificate and its related obligations under the terms of the Purchase Agreement: if it did, NJZ could not violate that Certificate, and the language of paragraph nine would be meaningless.

*See, e.g.*, *TravCo*, 736 S.E.2d at 325. Thus, the court concludes that the Purchase Agreement unambiguously confers only environmental obligations affecting the Austinville site to ALC, and that ALC therefore did not expressly assume the obligations listed in the No-Discharge Certificate.

Dixon relies heavily on the first sentence of paragraph five which, when read in isolation, transfers "all" permits, authorizations, and like obligations to ALC. (Purchase Agreement ¶ 5.) Since the No-Discharge Certificate falls within the ambit of "all operating, environmental, reclamation and like governmental permits, licenses, authorizations and bonds in effect as of October 25, 1982" (*id.*), Dixon argues, paragraph five must transfer NJZ's obligations under that Certificate to ALC. However, that sentence of paragraph five cannot be read in isolation. *See Babcock*, 788 S.E.2d at 244. As discussed above, Dixon's interpretation cannot be squared with the remainder of paragraph five or with paragraph nine, both of which indicate that ALC assumed responsibility only for the Austinville site and that NJZ retained the obligations under the Certificate. Since the court cannot interpret part of paragraph five to render paragraph nine meaningless when presented with a reasonable alternative, *see TravCo*, 736 S.E.2d at 325, Dixon's interpretation must fail.

Dixon's reliance on paragraph three of the letter amendment to the Purchase Agreement is similarly misplaced. Dixon argues that because that paragraph obligated G&W to give ALC access to "*all* records relating to said premises," including 1982 water-discharge records and studies of limestone tailings deposits, ALC must have taken on all environmental liabilities related to those records. (Dkt. No. 50-7.) Even assuming that ALC could expressly assume liabilities for Austin Meadows simply by gaining access to records about the tailings deposits on the site, the records to which that paragraph refers do not pertain to Austin Meadows. On its

face, that amendment only entitles ALC to waste-discharge records and hazardous-waste studies within records "relating to said premises." Read in conjunction with paragraph two, "said premises" refers to "the premises to be conveyed to the Buyer": the Austinville site. (Am. Purchase Agreement ¶ 2.) So, even if ALC assumed responsibility for the environmental liabilities related to those records, it would not assume responsibility for Austin Meadows.

Finally, Dixon argues that the court should infer that ALC assumed NJZ's environmental liabilities from the fact that it did not explicitly disclaim successor liability. Dixon notes that the Purchase Agreement stated that ALC was not a successor within the meaning of a contract with the Steelworkers Union, suggesting that ALC's failure to explicitly disclaim CERCLA successor liability indicates that it intended to assume successor liability. The court disagrees. The default rule is that a corporation that purchases the assets of another does not assume its liabilities. *PCS Nitrogen*, 714 F.3d 161, 173. Thus the court will not infer that ALC assumed all of NJZ's CERCLA liabilities from the fact that it did not explicitly disclaim them. *See Joseph Huber Brewing Co. v. Pamado, Inc.*, No. 05-cv-2783, 2006 U.S. Dist. LEXIS 67174, at *28–29 (N.D. Ill. Sept. 5, 2006). The court therefore concludes that the purchase agreement did not transfer NJZ's liabilities under the No-Discharge Certificate to ALC.

### 2. ALC did not impliedly assume NJZ's CERCLA liabilities

Dixon also argues that ALC impliedly assumed NJZ's environmental liabilities for Austin Meadows. Dixon relies on two documents for this claim: (1) a pre-purchase letter from JRLC to G&W discussing environmental liabilities; and (2) the joint letter that NJZ and ALC sent to the State Water Control Board the day that ALC purchased the Austinville site. In certain situations, a party may assume liabilities not mentioned in a contract where its actions nevertheless imply that it meant to assume such liabilities. *See City of Richmond v. Madison*

*Mgmt. Grp., Inc.*, 918 F.2d 438, 450–51 (4th Cir. 1990); *States Roofing Corp. v. Bush Constr. Corp.*, 426 S.E.2d 124, 127 (Va. Ct. App. 1993). However, because neither of the letters that Dixon cites suggests that ALC meant to assume liability for Austin Meadows, Dixon's argument fails.

First, Dixon points to a letter from C. E. Wells, the President of JRLC, to G&W's CEO John Thompson, dated December 9, 1981. In that letter, Wells discussed his concerns about the value of the waste piles of limestone. In relevant part, Wells stated:

> The "Bunker Hill" waste pile is reported to have three to four million tons of "fines." We would like to sell this; however, no one for the past thirty years has found a way to stockpile and spread the high moisture fines.
> . . .
>
> We have to consider the pending reclamation costs plus the potential liability of the 40-acre mass moving toward the river if the present dam is removed. Our company would hope that over a period of several years some of these "fines" may be moved. On this assumption, we will pay an additional twenty-five cents per ton for each ton sold from the "Bunker Hill" stockpile.

(Dkt. No. 51-15.)

Dixon asserts that the "40-acre mass" to which Wells refers must be Austin Meadows, since it is the only tailings pile that is described in terms of acreage and which abuts a dam, and that this letter therefore shows that ALC meant to assume liability for Austin Meadows. The court disagrees. First, it is not clear that the Austin Meadows tailings pile is the only one that could fit the description of a 40-acre mass of tailings near a dam. While Austin Meadows is occasionally described by its acreage in the record, the record also reflects that Austin Meadows was only 28.5 acres, and that Bunker Hill was bigger. (Def.'s Ex. A at 1061–62.) Furthermore, a former NJZ employee testified that NJZ never moved the fines on Bunker Hill because the

company was worried that "the dam would break and [the pile of fines] would go to the river." (Reynolds Dep. 34.)

But in any event, the context of that phrase makes clear that Wells was referring to Bunker Hill, not Austin Meadows.  The letter discusses the Bunker Hill waste pile throughout and does not mention Austin Meadows at all.  Moreover, Wells's concern about liabilities for the 40-acre mass leads him to a conclusion, in that same paragraph, about the proper purchase price for the Bunker Hill stockpile.  That would be a strange non-sequitur if his concerns were, in fact, about Austin Meadows.  Finally, the court notes that this letter was written during the course of negotiations about the purchase of the Austinville site, and that the Purchase Agreement makes clear that NJZ, not ALC, retained responsibility for the No-Discharge Certificate affecting Austin Meadows.  Accordingly, the court rejects Dixon's argument that this pre-purchase letter suggests that ALC impliedly assumed liability for Austin Meadows.

Next, Dixon argues that ALC and NJZ's joint letter to the State Water Control Board, which transferred "all permit responsibility and coverage between the current and new permitees" (Dkt. No. 51-20), shows that ALC impliedly assumed liability for Austin Meadows. But read in context, that letter does not contemplate the transfer of environmental liabilities for Austin Meadows to ALC.  The letter informed the State Water Control Board that ALC had purchased a property encompassing several discharges, that NJZ would retain ownership and continuing responsibility for one of them, and that ALC would assume responsibility for the rest of them starting on October 25, 1982.  The language on which Dixon relies indicates that ALC assumed responsibility for "said systems"—that is, the discharges located on the Austinville site. Accordingly, that letter does not indicate that ALC meant to assume liabilities as to Austin Meadows.

Since the communications on which Dixon relies do not support the conclusion that ALC intended to assume NJZ's environmental liabilities associated with Austin Meadows, the court rejects its implied assumption argument.

### 3. ALC is not a "mere continuation" of G&W

The court now turns to whether ALC is a continuation of G&W/NJZ under common law principles of successor liability.[6] Under the traditional "mere continuation" theory, a corporation may be held liable for the actions of its predecessor if, "after the transfer of assets, only one corporation remains, and there is an identity of stock, stockholders, and directors between the two corporations." *United States ex rel. Bunk v. Gov't Logistics N.V.*, 842 F.3d 261, 273–74 (4th Cir. 2016) (quoting *Carolina Transformer*, 978 F.2d at 838). Courts look to a number of factors in order to determine whether a corporation is a mere continuation of another:

> "(1) whether and to what extent there is an identity of ownership (the most important factor), (2) how the nature and scope of the two businesses compare, (3) whether there has been an asset transfer for less than adequate consideration; (4) whether two separate entities still remain after the transaction, (5) whether the new company continues in the same trappings as the old company, such as the same address, the same physical space and the same phone numbers; and (6) how the two companies' assets compare."

*Charles Schwab & Co. v. WS Wealth Mgmt., LLC*, No. 1:16-cv-352, 2016 U.S. Dist. LEXIS 166988, at *14 (E.D. Va. Dec. 2, 2016) (citing *Kaiser Found. Health Plan of the Mid-Atlantic States v. Clary & Moore, P.C.*, 123 F.3d 201, 204 (4th Cir. 1997)); *see also Fuisz v. Lynch*, 147 F. App'x 319, 321–22 (4th Cir. 2005).

The mere continuation theory requires a common-sense analysis "of corporate realities,

---

[6] Again, the court need not determine whether to apply the federal common law or Virginia state law formulation of the mere continuation test because those tests are functionally identical. *Compare Carolina Transformer*, 978 F.2d at 838 (applying the mere continuation test under federal common law) *with Kaiser Found.*, 123 F.3d at 205 (applying Virginia's formulation of the mere continuation test).

not mechanical application of a multi-factor test," *N. Shore Gas Co. v. Salomon Inc.*, 152 F.3d 642, 654 (7th Cir. 1998) *overruled on other grounds by Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983, 986 n.1 (7th Cir. 2010); *HRW Sys. v. Washington Gas Light Co.*, 823 F. Supp. 318, 330 (D. Md. 1993) (noting that the test for mere continuity has "a common-sense flavor about it"), and courts should be careful not to "elevate form over substance" when applying it. *Kaiser Found.*, 123 F.3d at 206 (quoting *Fiber-Lite Corp. v. Molded Acoustical Prods.*, 186 B.R. 603, 609 (E.D. Pa. 1994), *aff'd*, 66 F.3d 310 (3d Cir. 1995)). Despite this caution, courts have consistently recognized that identity of ownership is the most important factor under this theory, *e.g.*, *Kaiser Found.*, 123 F.3d at 205, and that if there is "no overlap of stock ownership" between the two companies, then the second company is not a mere continuation of the first. *Carolina Transformer*, 978 F.2d at 838; *Cf. Kaiser Found.*, 123 F.3d at 205 n.2, 208–09 (determining "whether the ownership of the two companies need be identical, or whether strong similarity will suffice in reaching a finding of successor liability").

Applying these factors, the court finds that ALC is not a mere continuation of G&W/NJZ under the traditional theory. First, and most importantly, there was no overlap of ownership whatsoever between G&W/NJZ and JRLC, or between G&W/NJZ and ALC. Although Dixon cites two cases for the proposition that *absolute* identity of ownership is not necessary for the mere continuation doctrine to apply, *Charles Schwab*, No. 1:16-cv-352, 2016 U.S. Dist. LEXIS 166988, at *14–16, *Waterford Inv. Serv. Servs. v. Bosco*, No. 3:10-cv-548, 2011 U.S. Dist. LEXIS 96046, at *51–52 (E.D. Va. July 29, 2011), there was nevertheless substantial overlap in the ownership of the companies at issue in those cases—a fact central to the Eastern District's analysis in both. *See Charles Schwab*, No. 1:16-cv-352, 2016 U.S. Dist. LEXIS 166988, at *16; *Waterford Inv. Serv. Servs. v. Bosco*, No. 3:10-cv-548, 2011 U.S. Dist. LEXIS 96046, at *51–53.

While the court agrees that absolute identity of ownership is not necessary, the court finds no support for Dixon's argument that the mere continuation doctrine can apply where there is no common ownership whatsoever. *See Carolina Transformer*, 978 F.2d at 838 (finding, without further analysis, that the mere continuation exception was inapplicable where there was no overlap of stock ownership between the two companies). Since there is no identity of stock ownership between G&W/NJZ and ALC/JRLC, the court finds that ALC is not a mere continuation of G&W/NJZ.

Moreover, even if it were necessary to consider them, the remaining factors do not support the conclusion that ALC was a mere continuation of G&W/NJZ's operations. It is true that there were some similarities between the two: for example, both operated mining operations on the Austinville site, both produced and sold agricultural limestone, and ALC sold agricultural limestone from the stockpiles produced by NJZ. But considered on the whole, the corporate realities of NJZ and ALC were very different. NJZ was, at heart, a zinc and lead mining operation, while ALC focused entirely on agricultural limestone. And although NJZ and ALC both produced agricultural limestone, they did so using very different processes. ALC never reopened NJZ's underground mine, and it removed the equipment that NJZ used to extract zinc and lead from the limestone—the process that lead to the production of the agricultural limestone stockpiles and the fines that were disposed of on Austin Meadows. In short, the similarities between the two companies are insufficient to render ALC a successor of G&W/NJZ.

Although ALC cannot be a mere continuation of G&W/NJZ under the traditional test, the Fourth Circuit has also applied the broader "continuity of enterprise" or "substantial continuity" test to determine corporate successor liability under CERCLA. *Carolina Transformer*, 978 F.2d at 838. In *Carolina Transformer*, the Fourth Circuit articulated this theory as an eight part test

that considers: "(1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities in the same location; (4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the successor holds itself out as the continuation of the previous enterprise." *Id.* The fact that ALC and G&W/NJZ share no common ownership is not determinative under this alternative theory. *See id.*; *United States v. Mexico Feed & Seed Co.*, 980 F.2d 478, 488 n.10 (8th Cir. 1992).

*Carolina Transformer*, however, was decided before *United States v. Bestfoods*, 524 U.S. 51 (1998), a case that cautioned against applying doctrines outside the common law to determine CERCLA liability. In *Bestfoods*, the Court sought to determine to what extent a parent corporation could be held liable for the actions of its subsidiaries under CERCLA. *Id.* at 60. The Court began by recognizing that CERCLA is silent on the issue of subsidiary liability. *Id.* at 62. Noting that "in order to abrogate a common-law principle, [a] statute must speak directly to the question addressed by the common law," *id.* at 63 (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)), the Court held that a parent corporation could be held liable for the actions of its subsidiary only when the corporate veil could be pierced—*i.e.*, when common law would allow the imposition of liability. *Id.* at 62–64.

Although *Bestfoods* was decided in the context of subsidiary liability, a number of courts have interpreted it to cast doubt on the continued validity of the substantial continuity test as a mechanism for determining whether a corporation is a successor under CERCLA. For example, in *New York v. Nat'l Servs. Indus., Inc.*, 352 F.3d 682 (2d Cir. 2003), the Second Circuit held that the substantial continuity test was no longer applicable to CERCLA in light of *Bestfoods*, interpreting that case to stand for the principle that "when determining whether liability under

CERCLA passes from one corporation to another, [courts] must apply common law rules and not create CERCLA-specific rules." *Id.* at 685. Noting that the substantial continuity test had been adopted "by only a handful of states," the court determined that the doctrine was not a part of general federal common law and, therefore, could not be used to determine successor liability under CERCLA. *Id.* at 687. A number of other courts have also interpreted *Bestfoods* to cast doubt on the viability of the substantial continuity test. *E.g.*, *K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1022 (8th Cir. 2007); *Mickowski v. Visi-Trak Worldwide, LLC*, 415 F.3d 501, 515 (6th Cir. 2005); *United States v. Gen. Battery Corp.*, 423 F.3d 294, 309 (3d Cir. 2005).

The Fourth Circuit has not had occasion to determine what effect *Bestfoods* had on the application of the substantial continuity test in the CERCLA successor liability context. However, recent cases in other contexts suggest that the Fourth Circuit interprets *Bestfoods* to stand for the proposition articulated by the Second Circuit in *National Services Industries*. Recently, the Fourth Circuit declined to apply the substantial continuity test in a case arising under the False Claims Act, a statute that, like CERCLA, is silent on successor liability. *See Bunk*, 842 F.3d at 274. As the Fourth Circuit reasoned:

> Put simply, the FCA does not speak to successor corporation liability and thus has no impact on the traditional common law principles governing successor corporation liability. It follows that *Carolina Transformer's* substantial continuity theory—a theory that alters the common law mere continuation rule—is not a viable theory for Bunk to pursue. Accordingly, we are satisfied that the district court properly declined to apply the substantial continuity test here.

*Bunk*, 842 F.3d at 274.

In light of the foregoing, this court finds that the Fourth Circuit would no longer apply the substantial continuity test to determine whether a corporation is a successor for purposes of

CERCLA.  Since CERCLA is silent as to successor liability, the court must apply common law

rules to determine whether ALC is a successor of G&W. [7]  And as *Bunk* makes clear, the

substantial continuity theory remains an abrogation of the common law.  *Bunk*, 842 F.3d at 274;

*see Nat'l Servs. Indus.*, 352 F.3d at 687 (noting that the substantial continuity test could perhaps

be absorbed into federal common law if it were widely adopted among the states).  In the

absence of a directive to the contrary, the court cannot apply the substantial continuity test.

Accordingly, since ALC is not G&W's successor under the common law mere continuation test

as previously discussed, the court finds that ALC is not G&W's successor for purposes of

CERCLA liability.

### III.     CONCLUSION

For the foregoing reasons, the court will grant ALC's motion for partial summary

judgment and deny Dixon's motion for partial summary judgment.

Entered: June 9, 2017.

/s/ Elizabeth K. Dillon

Elizabeth K. Dillon
United States District Judge

---

[7] Again, since the Supreme Court of Virginia has rejected the substantial continuity test, the court need not determine whether this question is governed by federal or state common law.  *See, e.g.*, *Urban Telcoms. Corp. v. Halsey*, No. 95-cv-35, 1996 U.S. Dist. LEXIS 1947, at *7 (W.D. Va. Feb. 8, 1996).