IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| DIXON LUMBER COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:16-cv-00130 |
| | ) | |
| AUSTINVILLE LIMESTONE | ) | By: Elizabeth K. Dillon |
| COMPANY, INC., | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION OF
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In this case, plaintiff/counter-defendant Dixon Lumber Company, Inc. (Dixon) and

defendant/counter-claimant Austinville Limestone Company, Inc. (ALC),[1] seek cost recovery,

contribution, and declaratory relief under the Comprehensive Environmental Response,

Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.* The overarching issue

before the court is who should be held financially responsible for environmental remediation and

reclamation of Austin Meadows, a portion of real property located in Wythe County, Virginia,

and owned by Dixon.

The case was tried with the court sitting as finder of fact over the course of three days.

Prior to trial, the parties submitted their proposed findings of fact and conclusions of law. (Dkt.

Nos. 174, 175.) The trial evidence included a significant number of exhibits, as well as

testimony and exhibits from depositions, many of which were not read into the record at trial, but

instead submitted after the trial for the court to review. Additionally, the parties submitted their

closing arguments in writing after the trial. (Dkt. Nos. 195, 196.)

---

[1] There are two separate corporate entities with this name, which have been referenced in the litigation as
ALC I and ALC II. Unless otherwise noted, references are to ALC II.

Based on the trial evidence, including the deposition testimony, the court issues this memorandum opinion, which constitutes its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I.  OVERVIEW

This case is fact-intensive, and the parties' arguments are heavily fact-dependent.  As a result, this opinion devotes a number of pages to the court's factual findings.  But without the broader context of the parties' positions, the importance of certain facts—and a reader unfamiliar with the case—likely will be lost.  Accordingly, the court begins with an over-simplified sketch of the relevant events and an overview of the parties' positions, and then continues to its findings of fact.

The parties are owners of adjoining properties in Wythe County, Virginia.  In 1992, there was a discharge of pollutants from the mine tailings pile on a portion of Dixon's property known as "Austin Meadows" into a nearby stream.  In response, in 1993, the parties entered into an agreement whereby ALC (who is in the mining business) agreed to remove the mine tailings from Austin Meadows, and, pursuant to a separate consent order that Dixon entered into with Virginia's Department of Environmental Quality (DEQ), the land eventually would be restored to a condition acceptable to DEQ.  Virginia's Department of Mines, Minerals and Energy (DMME), which issued ALC a permit to mine the tailings at Austin Meadows, also required reclamation of that portion of Austin Meadows that ALC was mining after its mining operations were completed.  Among other disputes, the parties disagree about the effect and interrelation of various agreements between the parties and a critical 1993 preliminary engineering review (PER) that was prepared by ALC and submitted to environmental agencies.

ALC's removal of the mine tailings proceeded far more slowly than anyone had

anticipated, although the parties dispute both the reasons for that slower pace and whether ALC was contractually obligated to complete removal at all, let alone in the five-year time frame set forth in the PER. Nonetheless, for a number of years, the two companies worked mostly cooperatively with each other and with the environmental agencies exercising oversight over the project at Austin Meadows. Over the years, the parties entered into subsequent (but largely identical) agreements, and Dixon and DEQ entered into subsequent consent orders, mostly to extend the time for completing removal of the tailings.

In June 2013, another important event occurred that is relevant to the parties' claims and the remediation of the property.[2] After a significant rainfall, a long-existing pipe and dam, which were supposed to ensure that a stream known as Jackson Branch went *around* the tailings pile, failed. This failure caused water to flow over the tailings and resulted in discharges of pollutants into streams and the nearby New River, into which both Jackson Branch and Buddle Branch (another stream near the tailings pile) flowed. These discharges resulted in public complaints and sparked a renewed interest in the site by both DEQ and DMME. Thereafter, Dixon, ALC, DEQ, and DMME entered into a Letter Agreement and agreed to take certain actions to stop the discharges and prevent future discharges. This resulted in additional remediation costs, some of which related to work on the Jackson Branch pipe and dam (the Jackson Branch Costs). In the

---

[2] The parties are not in complete agreement about the meaning of the terms remediation and reclamation. The court concludes that, while remediation is broader and encompasses reclamation, different tasks might or might not be considered "reclamation" depending on the particular project. Faulkner, a water quality expert, testified that "remediation" in this case includes the removal of the contaminates as well as actions taken to prevent contamination and that "reclamation" means any activity that "restores the area to its previous or undisturbed use." (Day 2 Trial Tr. at 44–45.) CERCLA response costs could include both. The preliminary engineering review (PER), a critical document that was referenced or relied upon in a number of other documents, also uses both terms in describing the work to be done at Austin Meadows. It uses the term "remediation" to refer to the entire process of extracting tailings and repairing the water channel and also to include reclamation. "Reclamation" is the final stage of the remediation process set forth in the PER and primarily involves grading, seeding, and re-planting vegetation in the area. In general, the court uses the terms as defined by Faulkner but recognizes that, under the PER, remediation encompasses all of the work to be done at Austin Meadows.

course of negotiating the specific manner in which the land should be remediated, however, significant disputes arose between the parties about who should be responsible for which costs. The relationship soured, and this lawsuit resulted.

Under CERCLA, each party seeks to recover from the other certain costs related to the remediation of the property. ALC's counterclaim also includes state law claims for breach of contract and quantum meruit. Each party suggests that the entirety (or nearly the entirety) of the CERCLA response costs should be borne by the other.

Dixon contends that response costs, and especially those related to that Jackson Branch June 2013 discharge, are ALC's responsibility. Dixon claims that the parties' initial agreement and the PER provided that Dixon would be responsible only for reseeding the land after ALC completed all other reclamation, including removal of pipes as they were uncovered. With regard to the Jackson Branch discharge, Dixon argues that ALC should have removed the tailings completely from the site long before that ever occurred, rather than keeping stockpiles of them onsite for customers to pick up from Austin Meadows without implementing precautions to prevent them being moved by water and wind. Dixon also contends that ALC repeatedly dragged its feet and failed to abide by the terms of the PER and the parties' initial contract to accomplish a timely removal. Had ALC timely removed the tailings and taken them offsite, Dixon contends, then the tailings would not have been on the property and pollutants from the tailings would not have made their way into the water.

On the Jackson Branch issue, ALC counters that the pipe and dam failed because of Dixon's negligent failure to maintain them and that Dixon knew as of at least 2011 that the pipe and dam needed repairing. But in any event, ALC contends it is not responsible for the Jackson Branch Costs, both because ALC was not an operator in the area where the pipe and dam failed

(which was outside its mining permit boundaries) and because the steps taken in response were all steps that were Dixon's responsibility under the original consent order and the parties' agreements.

One provision of CERCLA, 42 U.S.C. § 9607, subjects to liability "the owner and operator of a . . . facility," 9607(a)(1), and also subjects to liability "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of," 9607(a)(2), for "(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; (C) damages for injury to, destruction of, or loss of natural resources . . ." 9607(a)(4). "To establish a prima facie case of liability under CERCLA, a plaintiff must allege that: (1) release of hazardous substances has occurred, (2) at a 'facility,' as defined by the statute, (3) that caused the plaintiff to incur response costs, and (4) that the defendants are 'responsible parties,' again, as defined by the statute and interpretive caselaw." *United States v. High Point Chem.. Corp.*, 7 F. Supp. 2d 770, 774 (W.D. Va. 1998). "Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a)," and "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1).

Importantly, a number of both factual and legal matters relevant to the CERCLA claims were agreed upon prior to trial. Those agreements were memorialized by the court in its November 22, 2017 Order (Dkt. No. 171), and the court adopts them as part of its findings of

fact and conclusions of law. Specifically, the parties agree that:

1. ALC qualifies as an operator under 42 U.S.C. § 9607(a)(1);

2. ALC is a potentially responsible party under 42 U.S.C. § 9607(a)(2), if Dixon can prove that, from 1996 to 2015, there was a disposal and not just mere passive contamination or migration;

3. at least a portion of Austin Meadows is a facility under the definition in § 9601;

4. there were releases and/or threatened releases at Austin Meadows during the period of 1996 to 2015;

5. compliance with the national contingency plan is not at issue in this case, *i.e.*, the parties agree that any response costs Dixon can show it has incurred can be presumed to be necessary and consistent with the national contingency plan; and

6. the harm at the site is not divisible for purposes of apportionment of liability but may be divisible for purposes of allocating harm and determining contribution.

(Order 2, Dkt. No. 171.)

This leaves four primary issues for the court's resolution, which the court explains in more detail in its conclusions of law. The first two bear on whether Dixon can recover from ALC at all. First, did the parties' agreement transfer all CERCLA response costs to Dixon as ALC contends? For the reasons set forth below, the court's answer is "no." Second, did the entirety of the response costs for Austin Meadows arise from events *prior* to ALC's becoming an operator, such that there are no discharges for which ALC could be held responsible under CERCLA? Again, the court's answer is "no." Instead, the court concludes that there were response costs caused by releases that occurred when ALC was an operator, during 1996 to 2015. Third, does ALC bear any responsibility for the Jackson Branch Costs, which arose from failures at a location near ALC's operations, but outside of its permitted area, and thus (ALC

argues), out of the CERCLA "facility"?  The court's answer is "yes," in part because it concludes that the Jackson Branch Costs are properly considered part of the response costs at the facility where ALC was an operator.  Fourth and finally, because the court determines that ALC does bear responsibility for some portion of the remediation costs, the court considers the equities in order to determine how to allocate those costs between the parties.  The court's conclusions as to the proper allocation are set forth as part of its conclusions of law.

## II.  DISCUSSION

### A.  Standard of Review

Rule 52(a)(1) of the Federal Rules of Civil Procedure requires that the court make specific findings of fact and state conclusions of law separately in any action tried without a jury. Specifically, this court must appraise the testimony and demeanor of witnesses, as well as weigh the evidence and choose among conflicting inferences and conclusions which seem most reasonable.  *See Burgess v Farrell Lines, Inc.*, 335 F.2d 885, 889–90 (4th Cir. 1964).

The court must do more than announce statements of ultimate fact, *United States ex rel. Belcon, Inc. v. Sherman Constr. Co.*, 800 F.2d 1321, 1324 (4th Cir. 1986), but is not required "to make findings on all facts presented or to make detailed evidentiary findings . . . .  The ultimate test as to the adequacy of the findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence," *Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962).

**B. Findings of Fact**

The court's factual findings are as follows:

**1. Background regarding deposit of tailings and parties' purchases of land**

Prior to separate parcels being sold by Gulf & Western Industries (G&W) to the parties here, the properties now owned by Dixon and ALC were mined by a division of G&W called New Jersey Zinc Company (NJZ). (June 9, 2017 Mem. Op. 2–6, Dkt. No. 69.) NJZ, like many of the previous landowners of the properties, had mined the properties for lead, zinc, and limestone. As part of NJZ's mining operation, limestone tailings were stockpiled on its properties. (Day 1 Trial Tr. 65.)[3] A "tailing" is a waste by-product of a mining operation. (Day 1 Trial Tr. 65; Day 2 Trial Tr. 27, 28 (explaining that "[t]ailings are a waste material from an effort to separate marketable lead, zinc, or other metals from the mined material"; they no longer have "a marketable concentration" of whatever is being mined, "but there is still some concentration of those metals in the limestone sand").) According to the PER, the tailings at Austin Meadows contained slightly elevated levels of lead and zinc. (Day 1 Trial Tr. 65; Pl. Ex. 147.)

In 1982, ALC, which is also a mining company, purchased NJZ's operations, equipment, and millions of tons of limestone tailings stockpiled in an area called "Bunker Hill."[4] (Mem. Op. 4, Dkt. No. 69.) The property was purchased for the purpose of mining. (Day 1 Trial Tr. 65.)

In 1984, Dixon, a lumber company that had no interest in commercial mining, purchased the remaining adjacent acreage from NJZ for its timber value. (Day 1 Trial Tr. 65.) At the time

---

[3] "Day 1 Trial Tr." is Dkt. No. 191, Day 2 is Dkt. No. 192, and Day 3 is Dkt. No. 193. References to exhibits are to trial exhibits unless otherwise noted, and those documents are in the record at Dkt. No. 188.

[4] In a prior memorandum opinion, the court concluded that ALC was not a successor-in-interest to NJZ. Thus, it could not be held liable under CERCLA for NJZ's deposit of the limestone tailings. (Dkt. Nos. 69, 70.)

of that purchase, there was another large stockpile of limestone tailings on that property, located in an area known as "Austin Meadows."  Based on the testimony of witnesses available today, it is unknown whether the Dixon personnel involved in the acquisition of Austin Meadows knew the tailings were on the property.  (Dixon 9/28/2017 Dep. 17; Day 2 Trial Tr. 188–89.)  There is no evidence that anyone at Dixon knew the limestone tailings were present, and it is undisputed that the site was revegetated at the time of Dixon's purchase and that most of the tailings were below the surface.  Nonetheless, due to the passage of time, Dixon cannot state definitively that the persons purchasing on its behalf did not know of the existence of the tailings.[5]

In the years leading up to the sale of both properties, NJZ's mining operation was regulated under the Clean Water Act, which required the permitting, monitoring, and reporting of storm water discharges from multiple locations, all of which ultimately drained into the New River.  Notably, the Austin Meadows portion of NJZ's property was governed by a "No-discharge" certificate which prohibited the discharge of pollutants from the Austin Meadows tailings pile into the Buddle Branch stream, a tributary of the New River. (Pl. Ex. 54; Day 1 Trial Tr. 206.)

As part of its purchase of NJZ assets and land, ALC assumed the environmental obligations governing its own property, and ALC continued to mine its own property, the Austinville site, after its purchase.  ALC also agreed to "maintain its premises" and to "conduct its activities" so as not to cause NJZ to violate the Austin Meadows no-discharge certificate. (Day 1 Trial Tr. 206; Pl. Ex 54, at ¶ 9.)  Thus, ALC clearly had knowledge of the Austin Meadows no-discharge certificate.  By contrast, Dixon's purchase from NJZ did not include the

---

[5] Dixon does not ask the court to find it is entitled to an "innocent landowner" statutory defense under CERCLA, but only that the court consider its possible lack of knowledge of the tailings at the time of purchase in deciding an equitable allocation of costs.  (11/13/2017 Pretrial Conf. Tr. 23, 44, Dkt. No. 173.)

assumption of any environmental obligations.

### 2. Pre-agreement releases or discharges

In the summer of 1992, Virginia's State Water Control Board inspected Austin Meadows and determined that a 36-inch concrete pipe underdrain that carried Buddle Branch under the Austin Meadows tailings was failing. (Newman Dep. 24, 28.) Thus, portions of the tailings on that property were being discharged into Buddle Branch, and those discharges constituted unpermitted discharges of pollutants coming from Austin Meadows and negatively affected the water quality of Buddle Branch. (Newman Dep. 24, 28.) In August 1992, the State Water Control Board notified Dixon that, as the owner of Austin Meadows, it was responsible for the environmental problems existing on the property. (Def. Ex. 2.) By that time, the Austin Meadows tailings pile had been inactive for approximately twenty years, and, as explained above, the area was revegetated, such that the tailings were largely below the surface. (Day 1 Trial Tr. 71.)

In August 1993, DEQ issued Dixon, as owner of the property, a Notice of Violation (NOV) for the unpermitted discharges to Buddle Branch. As several DEQ witnesses testified, a NOV is not a finding that there has been a violation, but it is an allegation of a possible violation. (Bazyk Dep. 28, 30, 193; Davenport Dep. 22.)

### 3. The parties' agreement, the PER, and the 1994 consent order

#### a. The Parties' Agreement

After the NOV was issued, DEQ worked with ALC and Dixon to help them reach an agreement about how to deal with the discharges related to the tailings on Austin Meadows and how to remediate the site. (Pl. Exs. 214, 215.)

The Agreement entered into between the parties (Pl. Ex. 146), dated August 1993, was

drafted before the PER; ALC drafted both. (Day 1 Trial Tr. 53–54.) This agreement (the

1993/1995 Agreement) [6] contains the following language concerning the parties' obligations and

responsibilities:

> NOW, THEREFORE, in consideration of the premises and the mutual covenants and conditions hereinafter contained, the parties hereto agree as follows:
>
> 1.  Austinville Limestone shall prepare the Preliminary Engineering Review ("PER") required by the Department, on behalf of Dixon, and in connection therewith shall conduct such tests and maintain such equipment as may be necessary in connection with the PER.
>
> 2.  Dixon shall reimburse Austinville Limestone for direct costs incurred by it samplings and other services performed by other parties at the direction of Austinville Limestone in connection with its performing as provided in Paragraph 1 above, payable within thirty (30) days after receipt of invoices therefor from Austinville Limestone, provided, however, that such reimbursements shall not exceed a total of Two Thousand Dollars ($2,000.00).
>
> 3.  Austinville Limestone shall remove the tailings located on the property owned by Dixon described upon Exhibit A attached hereto ("Property") over a period not to exceed ten (10) years from the date hereof, in connection with the conduct of its business of selling limestone products from Austinville Limestone's adjoining property. The tailings removed by Austinville Limestone shall become its property for handling in such manner as it may determine and the manner in which such tailings are removed shall be at the discretion of Austinville Limestone, subject to direction of the Department.
>
> 4.  Austinville Limestone's activities on the Property shall be conducted in a manner that complies with standards acceptable to the Department.
>
> 5.  All activities conducted on the property by Austinville Limestone shall be considered to be remedial actions on behalf of Dixon for purposes of alleviating or reducing possible contamination of the waters and

---

[6] There are two versions of the first agreement, with two different signature pages. The first one, signed by Glenn Dixon (Garner's brother) and John Michener of ALC, does not indicate when it was signed. (Day 2 Trial Tr. 313, 314.) But that signed version was submitted on October 12, 1993, by John Michener of ALC as part of the PER submitted to DEQ. (Day 2 Trial Tr. 312–13; Pl. Ex. 5.) Then, there is another version of the agreement that was signed in December 1995 by both parties (but by Lathan Williams on behalf of Dixon and Michener of ALC) after the PER had been approved by DEQ. (Def. Ex. 7, Day 2 Trial Tr. 313–14.)

Austinville Limestone shall not be considered to be an "owner" or "operator" for purposes of laws and regulations enforceable by the Department.

6.      After removal of the tailings, it shall be Dixon's responsibility for all reclamation and revegetation of the Property as provided in the PER.

7.      At any time after Austinville Limestone has completed and submitted the PER to Dixon, Austinville Limestone may at any time, in its discretion, terminate this Agreement and cease its activities related thereto . . . .

(Pl. Ex. 146.)

The parties dispute the significance and meaning of several of these paragraphs, and the court's resolution of those disputes is set forth in its conclusions of law. One of the disputes concerns the discrepancy between, on the one hand, the ten-year term for removal in Paragraph 3 of the Agreement and, on the other, both the PER, which states that the tailings could be removed in five years (Pl. Ex. 147, at 4–5), and the Consent Order, which requires that removal be completed within five years (Pl. Ex. 150). As to the ten-year term, Garner testified that the term was in the Agreement before the PER was ever prepared. Pursuant to the later-prepared PER, Dixon contends, the removal was to occur over a period of five years. (Day 2 Trial Tr. 292.) Garner testified that the two time-frames were "consistent" because five years is a term "not to exceed" ten years (Day 2 Trial Tr. 293–94). It appears that the Agreement was re-signed in 1995, however, after approval of the PER and after entry of Dixon's Consent Order with DEQ, and it nonetheless continued to provide a ten-year term for removal. At the same time, Paragraph 3 states that the "manner" of removal is "subject to direction of the [DEQ]," which arguably incorporates the Consent Order, or at least subjects ALC to some direction and control by DEQ.

### b.  The Preliminary Engineering Review (PER)

Consistent with the requirement in Paragraph 1 of the Agreement, ALC prepared the

PER, which it submitted to DEQ on October 12, 1993.  (Pl. Ex. 147.)  The Agreement itself

references the PER, and as noted, the Agreement appears to have been signed another time after

the PER was completed and approved by DEQ.  (Day 1 Trial Tr. 103); *see also supra* note 6.

The PER itself is a relatively short document.  It contains several sections giving

background about the site and its current conditions, which includes background about how ALC

had mined the Bunker Hill site and the statement that ALC "plans to use techniques developed at

its Bunker Hill site to remove the Austin Meadows tailings without creating an additional

adverse effect on water discharge from the site."  (PER at 3, Pl. Ex. 147.)

The PER contains two sections that detail the proposed work to be done.  The first is

titled "Extraction Procedures," and the second is titled "Reclamation of the Site."  (PER at 4–5,

Pl. Ex. 147.)  The "Extraction Procedures" section includes the following statements and

activities:

> Limestone tailings will be removed from the site using techniques
> successfully employed at the adjacent Bunker Hill site for the past ten
> years.  Work will generally proceed from south to north.  All material
> could be removed within five years from start of the project. . . .
> Uncovered sections of 36" drain pipe will be moved as extraction
> activities proceed to the north.
> Fabric filter fences will be erected to filter surface drainage before
> entry into the drain system.  Neither Jackson Branch nor Buddle Branch
> will be re-routed during the course of the project.  When tailings
> extraction is completed, both Jackson and Buddle branches will flow in
> their original stream channels.
> Water discharge samples will be collected on a monthly basis from the
> pile underdrain discharge (location #4) . . . .  If the water discharge ever
> exceeds 125% of zinc levels shown in Attachment C, activities will be
> suspended until zinc levels are again under control.  Excursions above
> 125% of present zinc levels will be reported immediately to DEQ.  Results
> of monthly water monitoring samples will be supplied to [DEQ] on a
> quarterly basis.

(*Id.*)

The entirety of the PER section titled "Reclamation" states: "Upon completion of the

removal of the material by [ALC], [Dixon] will reseed the area with suitable vegetation and control erosion as needed. [Dixon] will replant any areas disturbed by the mining process in accordance with any agreement with the Virginia Department of Forestry. Dixon intends that, once reclaimed, this land will be reforested as well." (*Id.* at 5.)

According to Susie Dixon Garner, the current president of Dixon,[7] Dixon agreed to the arrangement because it was told that ALC desired to mine and sell the tailings from Austin Meadows as agricultural lime, and, pursuant to the proposed Agreement, she believed that all that Dixon would have to do was to reseed and revegetate the areas that ALC reclaimed upon completion of ALC's work. (Day 2 Trial Tr. 167–68.) Dixon's belief about the respective obligations was based on her review of the 1993/1995 Agreement, the PER, the Consent Order, and related documents. *Id.* Of course, ALC also stood to benefit from the Agreement because it already engaged in the mining and sale of limestone tailings. As it had anticipated, ALC was able to sell many tons of the tailings to its customers over the years it mined the tailings, and it earned more than five million dollars in gross sales.

Notably, the PER contains some assertions by ALC that ALC has now admitted either were inaccurate when made, or were otherwise speculative. (Day 1 Trial Tr. 66–68, 75.) These include the estimated amount of tailings at Austin Meadows (600,000 tons), where the actual number exceeded 900,000 tons (Day Trial Tr. 238); the annual amounts that ALC had successfully removed from its own property at Bunker Hill; and the statement that the tailings at Austin Meadows could be removed within five years. (*Id.*)

### c. The 1994 Consent Order

After approval of the PER by DEQ, Dixon and DEQ entered into a 1994 Special Order

---

[7] Garner is the granddaughter of the company's founder. (Day 2 Trial Tr. 165.)

on Consent (the 1994 Consent Order), to which ALC is not a party. (Pl. Ex. 150.) The 1994 Consent Order incorporates the PER by reference (Day 1 Trial Tr. 104; Pl. Ex. 153), and it contemplates that tailings removal will be completed within five years (Day 1 Trial Tr. 92). ALC has admitted that DEQ was relying on both the PER and the Consent Order in its oversight and enforcement roles. (*Id.* at 93.)

The Consent Order sets forth relevant background and notes that Dixon agrees to comply with the schedule set forth in the attached Appendix. (Pl. Ex. 150.) It further notes that the schedule allows Dixon to enter into an agreement with ALC, which will serve as a contractor for Dixon to remediate the Austin Meadows site through the removal of the limestone tailings pile. (*Id.* at 1.) The schedule directed Dixon to begin removal of the tailings pile by June 1, 1994, submit monthly water quality monitoring reports, submit annual reports to DEQ, and complete removal of the tailings pile by June 1, 1999. (*Id.* at 3, Appendix.) The Appendix also expressly provides that Dixon "shall operate this project in accordance with the PER." (*Id.* at 3.)

### d. The DMME Mining Permit

After entry of the Consent Order, ALC submitted a permit application to DMME, seeking to amend its current permit for its own property to include the retrieval of tailings at Austin Meadows. (DMME Permit Appl., Pl. Tr. Ex. 149.) The permit was required for ALC to remove the tailings from Austin Meadows. That application was submitted on November 27, 1995 (Day 1 Trial Tr. 94), and it included the PER as an attachment. (*Id.*) After ALC's submission of additional information, DMME issued ALC a mining permit. (Day 1 Trial Tr. 102.) Once ALC obtained the permit, it then had the exclusive right to mine tailings on Austin Meadows. (Day 1 Trial Tr. 95.) ALC did not begin removing tailings, though, until 1998.

### 4. Timing of tailing removal and timeline of events from 1993 to 2013

As noted above, under the 1994 Consent Order, tailings removal was supposed to begin by June 1, 1994. (Day 1 Trial Tr. 105, 109–10.) Almost a year later, in May 1995, ALC wrote to Mr. Allen Newman of DEQ; ALC's letter essentially apologized for the delay in starting tailings removal and explained that ALC had been conducting chemical testing to make sure the tailings would be acceptable to ALC's customers. (Pl. Ex. 145.) The letter advised that ALC intended to start the removal during 1995 and that ALC still believed it could meet the 1994 Consent Order's June 1, 1999 deadline. (*Id.*)

In fact, though, ALC did not begin removal until 1998, and, even then, the removal progressed slowly. The number of tons that ALC removed from Austin Meadows during the relevant time period is shown below, along with relevant notes:[8]

---

[8] The parties agree that the numbers below (taken from Pl. Ex. 229) are accurate with regard to the tonnage of tailings removed from Austin Meadows. There was a heated debate at trial, however, as to whether similar numbers for the Bunker Hill property, for the years 1996 to 2000, were correct or incorrect, a debate that also implicated whether certain documents or information had been improperly withheld in discovery. The parties do not dispute the accuracy of the Bunker Hill numbers for the years 2001 to 2016.

After reviewing prior orders from United States Magistrate Judge Ballou during a break in the trial proceedings, the court noted that Judge Ballou had allowed Kevin Mann's, ALC's president's, deposition testimony, which included "corrupted" or "incorrect" numbers as to Bunker Hill 1996 through 2000, to be corrected through an errata sheet. (Dkt. Nos. 136, 168.) So, the court allowed each side to put their own charts in, each with different numbers for Bunker Hill. Specifically, Dixon could use the otherwise corrupted numbers that Mann testified to in his deposition (as shown in Pl. Ex. 229) and ALC could introduce the "corrected" numbers through Mann's testimony (reflected in Defendant's Exhibit 57). (Day 3 Trial Tr. 63–66.) The "corrected" numbers provided show greater tons removed from Bunker Hill in those years.

Given the fact that Judge Ballou's orders were critical of ALC for discovery failures, the court will utilize the numbers provided by Dixon, despite the fact that those figures may not be factually accurate. The court emphasizes, though, that the court's ultimate decision in this case does not change regardless of which numbers it looks at for Bunker Hill for those years. In general terms, it is clear that—regardless of which set of numbers is used—a significantly larger tonnage of tailings was being removed from Bunker Hill than from Austin Meadows nearly every year from 1996 through 2016. Using the numbers proffered by Dixon, though, the total number of tons being removed from both sites from 1996 through 2000 was below (and in some years, very far below) ALC's self-estimate of its ability to remove 150,000 tons per year. The court notes, though, that ALC's proffered numbers (reflected in the second column of Def. Ex. 57) show that the tons removed from Bunker Hill in many of those years would be closer to 150,000. By accepting Dixon's numbers, then, there is more support for Dixon's argument that the estimated amounts of removal ALC included in the PER were inaccurate or misrepresentations.

**1998:** Removal begins:[9] 18,676 tons of tailings removed
**1999:** 99,752 tons of tailings removed[10]
**2000:** 15,012 tons of tailings removed
**2001:** 42,649 tons of tailings removed
**2002:** 31,947 tons of tailings removed
**2003:** No tailings removed[11]
**2004:** 2,797 tons of tailings removed
**2005:** 2,552 tons of tailings removed
**2006:** 5,799 tons of tailings removed
**2007:** 33,291 tons of tailings removed[12]
**2008:** 101,227 tons of tailings removed[13]
**2009:** 66,826 tons of tailings removed
**2010:** 45,229 tons of tailings removed
**2011:** 18,372 tons of tailings removed
**2012:** 65,316 tons of tailings removed
**2013:** 63,511 tons of tailings removed
**2014**: 27,993 tons of tailings removed
**2015**: 21,493 tons of tailings removed

As the removal occurred, DEQ granted several extensions to complete the removal

process, and the parties entered into several renewed agreements extending the time-frame for

removal. First, in 1999, there was an amendment to the 1994 Consent Order, in which Dixon

sought and received an extension of the deadline to remove tailings from 1999 to June 1, 2008.

(Day 1 Trial Tr. 114; Pl. Ex. 155.) This 1999 Consent Order notes that the "contractor [ALC]

---

[9] The 2004 NOV and letter from DEQ reflect tons of tailings removed by year, which shows none were removed prior to 1998. Mann testified in his deposition that he had no reason to dispute and could not dispute the numbers in that document. (Day 1 Trial Tr. 119.) But during trial, he testified that he had seen some documents showing that tailings removal began before 1998. (*Id.*) Nonetheless, even ALC's own exhibit offers no alternative numbers for any year before 1998. (Def. Ex. 57.)

[10] June 1, 1999, was the original deadline for completing tailings removal set forth in the 1994 Consent Order.

[11] Mann testified in his deposition that he did not know why no tailings were removed in 2003. At trial, he seemed to blame the weather, testifying that it was the wettest year on record in 25 years. (Day 1 Trial Tr. 137.) He admitted, though, that the low numbers removed in the next three years could not all be explained by the weather. (*Id.*)

[12] In 2007, ALC began selling pelletized products, which became their larger revenue stream. (Day 1 Trial Tr. 144.) The tons removed were almost all in the last quarter of the year, according to Mann.

[13] In 2008, ALC purchased an excavator for use in facilitating removal at both tailings sites.

has experienced numerous problems due to wet weather, chemistry of products[,] and market availability." (Day 1 Trial Tr. 114, Pl. Ex. 155.) Notably, though, and despite the fact that in 1995 ALC had said that it would keep DEQ apprised of any changes to the schedule, (Day 1 Trial Tr. 109, Pl. Ex. 145), there was no correspondence from ALC to DEQ concerning the schedule between ALC's assurance in May 1995 and 1999. ALC president Kevin Mann's explanation for this absence of correspondence was that ALC was "communicating through Ms. Garner at Dixon Lumber." (Day 1 Trial Tr. 126.)

Mann testified about the conditions that were causing the delay, including the wetness of the tailings pile and the lack of proper equipment or personnel to deal with it, and he conceded that a lack of effort by ALC could have been a factor. (Day 1 Trial Tr. 122–23.) Mann testified in general terms about the many problems ALC had in mining Austin Meadows and that "a lot of trial and error" was involved in figuring out how best to remove the tailings. (Day 1 Trial Tr. 236.)

During the initial years after removal began, Garner was responsible for submitting annual reports to DEQ and—consistent with Mann's testimony—she testified that ALC would give her the information for certain sections of the report and she would pass that along to DEQ. That information included operational and field observation data, and many of the annual reports referenced the same problems about which Mann testified. (Day 2 Trial Tr. 170–71; Day 1 Trial Tr. 226–27, 233–41; Def. Ex. 11; Def. Ex. 51 (annual reports for years 1998 through 2014).) These included weather-related issues and "slow development of a market," and a reference to ALC's estimate, in 1998, that the removal process "could easily take another ten years." (Day 2 Trial Tr. 207–09.) Thus, although Dixon did not—for the most part—have independent knowledge of what was causing the delays, Dixon certainly was aware of the problems as

conveyed by ALC.

The court finds that some of these problems—for example, the weather—certainly contributed to the delays but were not the fault of ALC; however, the court also finds that ALC should have known about some of the issues, such as on-site conditions, before it ever agreed to undertake the work and before it ever told DEQ (and Dixon) that the removal could be accomplished within a five-year time frame.[14] It is clear to the court that ALC prioritized its profitability over timeliness in tailings removal. Regardless of whether ALC's foot-dragging constituted a breach of the technical terms of its agreements with Dixon, ALC certainly did not act in a manner that showed diligent care of the hazardous substances with which it was working.

In December 2003, Dixon and ALC signed a "Limestone Removal Agreement," which mirrors the 1993/1995 Agreement in all significant respects. (Def. Ex. 13.) In the Limestone Removal Agreement, ALC again promised to "make commercially reasonable efforts to remove the tailings . . . over a period of five (5) years." (*Id.* ¶ 1.) The document provided ALC with the option of renewing it for an additional five years after the termination of the initial five-year period. (*Id.*) The parties also agreed in that document that one of the reclamation tasks, the regrading of Austin Meadows after tailings removal, should be done by ALC. (*Id.*)

On June 21, 2004, DEQ issued a NOV to Dixon for the delay in tailings removal at Austin Meadows. (Day 1 Trial Tr. 117–18; Pl. Ex. 156.) In March 2006, DEQ sent another warning letter to Dixon concerning the delay. (Day 1 Trial Tr. 124; Pl. Ex. 157.)

On December 28, 2007, Mann sent an email to DEQ in which he apologized for ALC's "negligence" in getting drainage established, admitted that ALC had a "poor" track record in

---

[14] For example, ALC insists that "Austin Meadows' lower elevation and poor drainage made drying of the tailings for sale far more difficult than it was at Bunker Hill." (ALC Closing Arg. 15, Dkt. No. 195.) The lower elevation and its potential consequences for drainage, though, were hardly unforeseeable.

timely removing the tailings, and assured DEQ that ALC's new management would place a renewed focus on handling the removal at Austin Meadows. (Pl. Ex. 158.) Mann testified that the letter was sent to DEQ in order to help Dixon get an extension of the Consent Order deadline for tailings removal from DEQ. (Day 1 Trial Tr. 185.) Nonetheless, while attempting to backtrack from his use of the word "negligence" in his email to DEQ, Mann agreed during trial that the pace of removal had been slow and that ALC had largely been mining Bunker Hill and allowing Austin Meadows to "lie fallow." (Day 1 Trial Tr. 129–36.) Mann also was forthright in his testimony about failures subsequent to that letter. For example, the letter told DEQ that ALC would begin removing tailings on a year-round basis, and Mann admitted that was ALC's intent, but that did not happen. (Day 1 Trial Tr. 172–73.)

The June 1, 2008 removal deadline under the 1999 Consent order passed without completion of removal. In fact, only about half of the estimated 600,000 tons of tailings had been removed by that point. (Pl. Ex. 165 at 2.) Soon thereafter, in October 2008, Dixon and DEQ entered into yet another consent order. (Dkt. No. 183–84; Pl. Ex. 165.) That order (the 2008 Consent Order) set a June 1, 2015 deadline for the complete removal of all tailings. (Day 1 Trial Tr. 183–84.) The order also fined Dixon $16,109 for not meeting the June 1, 2008 removal deadline from the second consent order and required payment within 30 days. (Day 1 Trial Tr. 184.) In order to reimburse Dixon for that fine (in an attempt to "make it right" and because Mann felt morally obligated to do so (Day 1 Trial Tr. 142, 186)), ALC and Dixon agreed that the royalty paid to Dixon from each ton of tailings sold would increase from 20 cents per ton to 30 cents. This was reflected in the First Amendment to the Limestone Removal Agreement. (Def. Ex. 19.) Over a period of about two years, the increased royalty generated approximately $15,000 in revenue to Dixon, which was designed to repay Dixon for the fine. (Day 1 Trial Tr.

185–88; Day 2 Trial Tr. 177–78.)[15]

As is evidenced from the numbers set forth above, removal continued to occur from 2008 until 2013, albeit still at a slower pace than suggested in the PER.

### 5. Discharges related to the failure of Jackson Branch pipe and dam

In June 2013, DEQ received public complaints concerning sediment traveling from the Austin Meadows site and a resulting sediment bar that had appeared in the New River. In response to these complaints, both DEQ and DMME investigated. DEQ's investigation showed that the pipe carrying Jackson Branch around the tailings on Austin Meadows and the impoundment protecting it had failed after a significant rain event, causing water to flood the tailings pile and release sediment into Jackson Branch. This failure caused a loss of sediment from Austin Meadows and elevated readings of contaminants in Buddle Branch. (Def. Ex. 22 at 2.) The following month, "the piping was reinstalled and the diversion reestablished," but sediment loss "continue[d] to occur, again affected by rainfall events." (*Id.*)

Following the June 2013 discharge, DMME issued a number of special orders to ALC directing it to take certain steps at Austin Meadows, and other orders giving extensions to complete those steps. Three August 2013 orders required ALC to: (1) provide an engineering plan that detailed how ALC would meet DMME regulations on installing drainage controls and controlling sediment into Austin Meadows' site; (2) work with Dixon to provide a final reclamation plan for the site; and (3) install temporary sediment basins and filtration structures. (Day 3 Trial Tr. 173–77.) DMME also issued orders in September and October 2013, extending the time to finalize the reclamation plan and start implementation. (Day 3 Trial Tr. 177–78,

---

[15] Garner testified that she thought ALC had repaid the entire $16,000 amount, but she was not sure. (Day 2 Trial Tr. 178.) Mann testified that the amount paid back through the increased royalties was approximately $15,000. (Day 1 Trial Tr. 186.) The court utilizes Mann's figure, given his certainty and Garner's uncertainty.

184–85.)  The actions required by these orders included controlling sediment and fixing holes in pipes in areas ALC had disturbed.  (Pl. Exs. 166–74.)  Although DMME directed these orders to ALC, Mann testified that several of these orders were related to the November 2013 Letter of Agreement (LOA), discussed next, and both companies were required to comply with certain of the orders' requirements pursuant to the terms of the LOA.  (Day 3 Trial Tr. 174–76.)

According to Philip Skorupa, who works for DMME, the special orders were issued to ALC as the permit holder to address the uncontrolled discharge at the mining site.  As Skorupa testified, even though the Jackson Branch pipe that failed was not within ALC's permit area, the water from that pipe came into the permit area and was interacting with tailings and causing the loss of sediment.  Thus, DMME still wanted to ensure that the permit's requirements about sediment control on the mine site itself were met.  (Skorupa Dep. 115.)  Skorupa also explained that, as the entity holding the DMME mining permit, ALC had the obligation of reclamation of the land within its permit boundaries once mining was complete.  (Skorupa Dep. 37.)  Notably, ALC did not contest and complied with those special orders.  (Skorupa Dep. 90–91, 147.)

As noted above, in November 2013, both parties, in conjunction with DEQ and DMME, executed a Letter of Agreement (LOA).  (Def. Ex. 22.)  That LOA required certain actions in order to fix the problems at Jackson Branch and to monitor water quality in the wake of the failure and as remediation occurred.  Mann testified that he believed the actions were the obligation of both Dixon and ALC.  For example, the LOA required weekly reports and water testing, for which ALC took primary responsibility, although Mann testified that the cost of that testing should be borne by Dixon.  (Day 3 Trial Tr. 94–96.)  In general terms, the LOA required ALC and Dixon to work together in order to devise a plan to meet erosion control and drainage requirements at Austin Meadows in the immediate future.  In particular, Exhibit 3 to the LOA is

significant to the court's analysis. It was apparently drafted by ALC, not by DEQ, but it purports to allocate the work tasks and financial responsibility of the LOA obligations between the two parties. (Def. Ex. 22, at 9.)

Specifically, Exhibit 3 to the LOA states that ALC would perform much of the actual work with the balance being performed by contractors. (*Id.*) It further states: "Any work performed or contracted by [ALC] on [Dixon's] behalf will be approved first by Dixon." (*Id.*) It then notes that Dixon would "have primary financial responsibility for stream channel design" and that "reclamation (except for re-grading)" would also be Dixon's responsibility. ALC agreed to regrade the site and to be "financially responsible for implementing engineered sediment controls within areas it has disturbed during tailings removal." (*Id.*) But Dixon would be financially responsible for "control of sediment and/or surface water entering tailings removal site from Jackson Branch." (*Id.*) Lastly, ALC would perform required water testing, but Dixon would reimburse ALC for the laboratory costs. (*Id.*)

Garner admitted to signing the LOA, including Exhibit 3, although she claims Dixon did so under "duress" and because "[t]he government agencies were pressuring" it. (Day 2 Trial Tr. 260.) Garner downplayed the significance of the document at trial, noting that the LOA expired automatically in "November 2014, before any work was done" and that ALC was required to seek Dixon's approval before incurring costs. (Day 2 Trial Tr. 258–59.) It is undisputed that ALC never sought or obtained Dixon's approval for work while the document was in effect. Regardless, the court does not find Garner's claim of duress persuasive and finds the document significant in that it shows the parties' agreement as to their respective financial responsibilities.

After entering into the LOA, Dixon and ALC jointly hired civil engineer Kevin Heath to prepare the required evaluation and initial plan. That report was submitted on October 30, 2013,

approved by both agencies, and made an exhibit to the LOA.  (Bazyk Dep. 20 (noting that DEQ approved Exhibit 2 to the LOA, which is a sediment control plan by Kevin Heath designed to address immediate concerns at the Jackson Branch site).)

The LOA also required Dixon and ALC to submit final reclamation plans for Austin Meadows.  In December 2013, the parties submitted a joint report and initial plan prepared by Heath (Def. Ex. 23), but that plan was rejected by the agencies.  Eventually a revised plan prepared by Heath was submitted in August 2014 and approved by DEQ and DMME that same month, with several comments.  (Def. Ex. 27–29; Newman Dep. 151, 157–58.)  The approved plan included an open stream channel for both Buddle and Jackson Branches.  (Def. Ex. 29.)

In December 2014, DEQ issued a NOV to both Dixon and ALC as a result of the 2013 discharges.  (Def. Ex. 32.)  ALC challenged the NOV as to it and engaged in DEQ's early dispute resolution process.  Ultimately, that process resulted in DEQ withdrawing the NOV as to ALC, but not as to Dixon.  As explained by Melanie Davenport of DEQ, who made the withdrawal decision, ALC was determined not to be responsible for those discharges because the area of the failures was not within ALC's mining permit and because ALC had not been working in the area of the failures.  (Davenport Dep. 32–35 & Davenport Dep. Ex. 4 (admitted at trial as Def. Ex. 59); *see also* Day 3 Trial Tr. 157–58.)  Thus, Davenport concluded that ALC could not be held responsible for the June 2013 discharges.  This conclusion is also consistent with the testimony of another DEQ witness, Crystal Bazyk.  Bazyk works for the enforcement arm of DEQ and was involved in dealing with the problems with Jackson Branch from 2013 on.  She testified about emails that she authored in 2015 concerning problems at the Jackson Branch dam and that the emails indicate, at least at the time, her belief that Dixon was responsible for the Jackson Branch problems because the breach was outside of the ALC permit boundary, but on

Dixon's property.  (Bazyk Dep. 51–53.)[16]

ALC faults Dixon for the problems at Austin Meadows in 2013 and 2014, accusing Dixon of failing to maintain the Jackson Branch pipe and dam, and noting that in a 2011 report prepared by Heath and submitted by Dixon to DEQ, there was evidence that portions of the pipe had been exposed due to erosion.  (Def. Ex. 21.)  The court finds that the evidence shows that Dixon's negligence was the primary reason for the releases.  For example, Heath, offered his expert opinion that the primary cause of sediment leaving Austin Meadows was the failure of the Jackson Branch pipe and dam.  (Heath Dep. 39.)  Specifically, Heath opined that the majority of the sediment going to Buddle Branch at the time was due to excess water from Jackson Branch getting on the tailings area and water flowing on to those tailings from pipe leakage or seepage through the embankment.  (*Id.*)  The court thus finds that the Jackson Branch pipe and dam problems were caused primarily by Dixon's failure to maintain that section of pipe, but it also notes that significant heavy rains contributed, for which neither party is responsible.  The court further finds that other portions of the same piping system were within ALC's mining permit area.  Moreover, an October 30, 2013 report by Heath determined/explained that breaks in that piping as well as at two of the standpipes in the Buddle Branch channel were allowing entry of surface water at the facility.  (Ex. 2 attached to the LOA.)

In 2014, ALC removed 27,993 tons of tailings from Austin Meadows, and in 2015, it removed 21,493 tons.  The parties appear to agree that the removal met the June 1, 2015 deadline under the 2008 Consent Order.  (Day 3 Trial Tr. 138.)  During this period, ALC altered its

---

[16] As referenced in one of the letters from Dixon's counsel, in 2015 ALC sought an expansion of its permit to include additional acreage closer to Jackson Branch.  Mann testified, though, that the new area added was at least 50 yards from Jackson Branch.  (Day 3 Trial Tr. 146–47; Def. Ex. 37.)  Dixon does not assert that ALC caused the June 2013 breach at Jackson Branch based on its nearby operations.  (Day 3 Trial Tr. 6.)

process for removal of the tailings from Austin Meadows. Instead of excavating them and leaving them in temporary stockpiles on site, it hauled the tailings to its own property. (Day 1 Trial Tr. 179–80; Pl. Ex. 192.)

In 2015, however, there was another problem with a breach in the Jackson Branch dam, which was causing pollutants to be discharged into Jackson Branch. There were repeated communications between Bazyk and Garner or counsel for Dixon following this event, in which Bazyk requested daily reports about Dixon's response. (Bazyk Dep. Ex. 5.) The emails characterized the situation as urgent and required an urgent response. In those emails, Dixon's counsel repeatedly referred Bazyk to ALC and DMME, despite several notifications from Bazyk that the area at issue was outside of ALC's permit area and that ALC was not considered by DEQ to be the "responsible party." (*Id.*) Many of the same emails from Bazyk also requested a reclamation plan from Dixon that would address Austin Meadows, including Jackson Branch, but Dixon did not provide it in a timely fashion. Ultimately, Dixon was issued another NOV on July 2, 2015, for failing to submit an acceptable reclamation plan. (Bazyk Dep. 73–75; Ex. 6.)

### 6. Post-LOA events and breakdown in communications

Without delving into unnecessary detail, the court notes that the parties eventually experienced a significant breakdown in communications and cooperation. Specifically, after the August 2014 approval of Heath's revised plan, ALC and Dixon met to discuss the implementation of that plan, and disputes arose at that time over the cost of the plan. (Day 3 Trial Tr. 105–06.) According to Mann, Dixon determined that the cost seemed excessive, and so Dixon and ALC agreed to try a different route. (Day 3 Trial Tr. 106-07.)

They agreed to work with Ben Faulkner, a water quality expert, to develop an alternative plan, and he was hired by both of them. Faulkner examined the site in late 2014, and he prepared

a report for submission to DEQ.  (Day 2 Trial Tr. 81–84.)  His plan was to keep the Buddle

Branch pipe "as a way to separate Buddle Branch from the restored area and any tailings, as long

as that was feasible going from south to north."  (Day 2 Trial Tr. 130.)  In the course of

finalizing Faulkner's plan to submit to DEQ by a January 15, 2015 deadline, however, Mann

raised the issue of which company was going to pay for which portions of Faulkner's

reclamation plan.  Thereafter, a dispute arose between the parties regarding who was supposed to

pay for what throughout the entire remediation and reclamation.  That was essentially the start of

a near-complete breakdown in communications.  (Day 3 Trial Tr. 114–16.)  Continuing disputes

and communications about who should pay for what followed, which ultimately led to this

lawsuit.

Ultimately, Dixon, acting on its own, submitted Faulkner's plan to DEQ.  DEQ disagreed

with Faulkner's approach, however.  (Day 3 Trial Tr. 118.)  Unlike Faulkner's plan, which

proposed to leave the Buddle Branch pipe in place, the agencies sought—and ultimately

required—an open channel for both Buddle Branch and Jackson Branch, just as Heath had

proposed.  (Newman Dep. 168–69 & Dep. Ex. 40; Bazyk Dep. 42¬–44.)  Indeed, no one has

disputed that DEQ and DMME wanted an open stream channel, not a piped channel for Buddle

Branch.  (See Heath Dep. 58–59, 193–94.)  According to Mann, ALC "scrambled" to find

another engineer and hired Gordon Wright of Wright Engineering to submit a separate proposed

reclamation plan, which was sent to DMME and DEQ in March 2015.  (Def. Ex. 39.)

Thereafter, DEQ and DMME approved a revised Wright plan (after ALC sought Dixon's input),

which was designed to render the remediation costs less expensive.  (Skorupa Dep. 131, Day 3

Trial Tr. 118.)

ALC then hired a contractor to perform much of the work required by Wright's plan.

ALC billed Dixon for the costs it incurred, but it did not include costs for "erosion, control, grading, and ordinary limestone removal expenses." (Day 3 Trial Tr. 126–27, Def. Exs. 47, 48, 49, 50.) None of the invoiced expenses have been paid by Dixon to date. At the time of trial, not all of the expenses had been incurred because not all of the reclamation work had been completed. (Day 3 Trial Tr. 132–34.) Dixon had performed much of the reseeding, but had not contracted for or performed any of the other work required under the reclamation plan. (Day 3 Trial Tr. 131.)

### 7. Claimed expenses and revenues

Both parties have expended monies that they believe should be borne by the other party. The court discusses them generally here and addresses them in more detail when allocating expenses. With regard to Dixon, Garner testified that Dixon paid the entirety of Heath's fee, as well as Faulkner's, despite the fact that Heath was originally engaged by both parties. (Day 2 Trial Tr. 179–81.)

Garner also testified that she did not believe Dixon should be held responsible for water quality testing throughout the course of the tailings removal. She explained that, pursuant to the PER, she believed ALC was responsible for conducting that testing. Despite Garner's stated belief, ALC routinely deducted the cost of its water quality tests from the royalties it paid Dixon, and Dixon never objected to those deductions. (Day 2 Trial Tr. 183–84.)

Additionally, Trial Exhibit 205 contains a series of receipts paid by Dixon, and Garner testified that all of those expenses related to the response costs and remediation. (Day 2 Trial Tr. 187.) Dixon asserts that all of these expenses should be borne by ALC. ALC disagrees and, in particular, argues that any expenses related to Jackson Branch repairs or remediation should be entirely Dixon's responsibility.

For its part, ALC first notes that it had paid Dixon approximately $150,000 in royalties during the 2003 to 2015 period. Mann testified that it was possible, if all tailings that had been removed from Austin Meadows to ALC's property were able to be sold, that the remaining royalties would amount to about $50,000, although he very much doubted that those tailings would all be saleable. (Day 3 Trial Tr. 139.) ALC also contends that it has expended—and will continue to expend—a significant amount of other monies to reclaim the site and that those costs should be borne by Dixon. ALC estimates that the total cost of the approved stream redesign at the site and other reclamation costs will be approximately $950,000. This includes about $370,000 for what ALC calls its "hauling costs," which it incurred to move the tailings off-site once excavated, rather than having customers haul them from Austin Meadows. This hauling was done near the end of removal in order to meet the 2015 deadline.

## 8. Respective claims of the parties

Each party seeks relief from the other under nearly identical provisions of CERCLA. Specifically, in its latest complaint (Dkt. No. 85), Dixon has asserted the following claims against ALC:

> Count I: CERCLA Cost Recovery under 42 U.S.C. § 9607(a)(1) and (a)(2);
> Count II: CERCLA Contribution under 42 U.S.C. § 9613(f)(3)(B); and
> Count III: CERCLA Declaratory Judgment under 42 U.S.C. § 9613(g)(2) and 28 U.S.C. § 2201.

In its counterclaim (Dkt. No. 9), ALC has asserted the following claims against Dixon:

> Count I: CERCLA Cost Recovery under 42 U.S.C. § 9607(a)(2);
> Count II: CERCLA Contribution under 42 U.S.C. § 9613(f)(1);
> Count III: CERCLA Declaratory Judgment under 42 U.S.C. § 9613(g)(2) and 28 U.S.C. § 2201;
> Count IV: Breach of Contract; and
> Count V: Quantum meruit.

### 9. Prior legal rulings and trial proceedings

The court issued several orders in this case prior to trial. These included an opinion and order concluding that ALC was not a successor-in-interest to NJZ and thus could not be liable under § 9607(a)(1) as an "owner" (Dkt. Nos. 69, 70), and an opinion and order granting ALC's motion for partial dismissal, which dismissed an arranger liability claim in Dixon's amended complaint, asserted pursuant to § 9607(a)(3) (Dkt. Nos. 134, 135). Although that dismissal was without prejudice, Dixon did not seek to amend its complaint prior to trial.[17]

At the close of Dixon's evidence, ALC moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c). The court, however, declined to render any judgment until the close of evidence. (Day 3 Trial Tr. 23–24, 263.)

## C. Conclusions of Law

### 1. Overview

There is no clear answer, either from the documents or from the assessments of the government agencies, as to who should be financially responsible for what in terms of remediation or reclamation of Austin Meadows. According to DMME, ALC is responsible for reclamation of the portion of Austin Meadows it mined because of its permit. (Skorupa Dep. 75; *see also, e.g.*, Newman Dep. at 92 (agreeing that "as far as the Commonwealth is concerned, DEQ has jurisdiction over Dixon Lumber pursuant to the Consent Order, and DMME would have had jurisdiction over [ALC] at the property").) Skorupa, the only DMME witness whose testimony was offered, noted that the DMME permit approved the drainage plan, which included that ALC was obligated to remove the drainpipe and return Buddle Branch to its original stream

---

[17] At trial, Dixon moved to amend the complaint to conform with the evidence at trial and to reassert an arranger liability claim. The court denied that motion. (Day 3 Trial Tr. 9–13, 161–62.)

channel. (Skorupa Dep. 72.) Under its permit with DMME (which included the reclamation plan set forth in the PER), ALC also agreed to provide temporary vegetative cover to prevent erosion. (Skorupa Dep. 75.)

According to DEQ, because its 1994 and 2008 Consent Orders were with Dixon, it is Dixon that is responsible to DEQ for any unpermitted discharges from the site and the related remediation of the site, although DEQ takes no position as to who is financially responsible for the remediation. (Bazyk Dep. 18 (testifying that DEQ would normally play no role in deciding as between an owner and its contractor, who pays for what, regardless of the assignment of responsibility for completing tasks in an agreement).) Bazyk also testified that she could not be sure if DEQ played any role in drafting Exhibit 3 to the 2014 LOA (which seems to place much of the financial responsibility with Dixon) or if ALC and/or Dixon submitted that Exhibit to DEQ. (*Id.*)

The various documents in the case, moreover, either do not address the topic at all or are inconsistent as to who bears financial responsibility for certain tasks. For example, the 1993/1995 Agreement provides that ALC "shall remove the tailings . . . in connection with the conduct of its business of selling limestone products from [ALC's] adjoining property," but it does not clarify whether ALC or Dixon is to pay for hauling costs regarding such removal. (Pl. Ex. 146 ¶ 3.) And although the 1993/1995 Agreement states that "it shall be Dixon's responsibility for all reclamation and revegetation," (*id.* ¶ 6), what is considered "reclamation" is not entirely clear, and the Limestone Removal Agreement provides that ALC is responsible for regrading, a reclamation task, (Def. Ex. 13).

In short, much of the evidence, together with the parties' repeated reliance on the documents and on the statements of representatives from Virginia agencies, does not provide

clarity and will not provide a definitive answer as to which party is financially "responsible" for any of the response costs at the site, although all of the evidence bears on the issue of proper allocation of costs. Ultimately, the inquiry of financial responsibility must be governed solely by CERCLA, which Congress enacted "to address the increasing environmental and health problems associated with inactive hazardous waste sites," *Nurad Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 841 (4th Cir. 1992), and the authority interpreting it.

Prior to addressing either party's prima facie case for liability and contribution, however, the court turns to ALC's threshold argument, which is that judgment must be entered in its favor because of what it calls an indemnification provision in the parties' Agreements.

### 2. The parties' Agreements do not transfer all responsibility for CERCLA response costs to Dixon.

ALC first contends that the parties' Agreements shifted all liability for CERCLA response costs to Dixon. According to ALC, Paragraph 5 of the 1993/1995 Agreement "clearly and unmistakably allocate[] to Dixon all CERCLA liability related to Austin Meadows" (ALC Closing Arg. 3, Dkt. No. 195), thus precluding Dixon's claims against ALC as a potentially responsible party under 42 U.S.C. § 9607(a) and preventing Dixon from seeking contribution under § 9613. Paragraph 5 states:

> All activities conducted on the [Austin Meadows] property by [ALC] shall be considered to be remedial actions on behalf of Dixon for purposes of alleviating or reducing possible contamination of the waters and [ALC] shall not be considered to be an "owner" or "operator" for purposes of laws and regulations enforceable by the Department [DEQ].

(Pl. Ex. 146.)

"CERCLA permits parties to shift the burden for paying response costs through contractual indemnification and release agreements." *Ashley II of Charleston, LLC v. PCS*

32

*Nitrogen, Inc.*, 791 F. Supp. 2d 431, 472 (D.S.C. 2011); *see also C.P. Chems., Inc. v. Exide Corp., Inc.*, 14 F.3d 594 (Table), No. 93–1426, 1993 WL 535277, at *1 (4th Cir. Dec. 28, 1993) (stating that CERCLA liability can be allocated by contract); *Dent v. Beazer Materials and Serv., Inc.*, 993 F. Supp. 923, 939 (D.S.C. 1995), *aff'd*, 156 F.3d 523 (4th Cir. 1998) ("Under CERCLA, parties are free to contractually shift the burden for liability for response costs among themselves."). "A private party contract which apportions CERCLA liability must contain a provision which allocates risks of this nature to one of the parties." *Ashley II*, 791 F. Supp. 2d. at 472 (citing *Dent*, 993 F. Supp. at 939). Although "[s]uch agreements cannot alter or excuse the underlying liability," they can "change who ultimately pays that liability."[18] *Id.* (citing *Vill. of Fox River Grove v. Grayhill, Inc.*, 806 F. Supp. 785, 792 (N.D. Ill. 1992)).

Thus, courts will enforce a contract that allocates loss suffered by imposition of CERCLA liability "where the provisions evince a clear and unmistakable intent of the parties to do so." *Keywell Corp. v. Weinstein*, 33 F.3d 159, 165 (2d Cir. 1994). Federal courts determine the intent of the parties' agreements by applying rules of contract construction under state law. *See PCS Nitrogen, Inc. v. Ashley II of Charleston, LLC*, 714 F.3d 161, 173 (4th Cir. 2013). When contract terms are clear and unambiguous, the terms should be given their "usual, ordinary, and popular meaning." *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012). If,

---

[18] Courts derive this principle from the two seemingly inconsistent sentences that comprise § 9607(e)(1):

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

Courts reconcile these two sentences "by construing them to mean that responsible parties may not transfer their CERCLA liability, but may obtain indemnification for that liability." *Peoples Gas Light & Coke Co. v. Beazer East, Inc.*, 802 F.3d 876, 880 (7th Cir. 2015); *see also SmithKline Beecham Corp. v. Rohm & Haas Co.*, 89 F.3d 154, 158 (3d Cir. 1996) ("[R]esponsible parties can lawfully allocate CERCLA response costs among themselves while remaining jointly and severally liable to the government for the entire clean-up.").

however, the terms of the contract are ambiguous, the court must determine the "parties' intent based on consideration of extrinsic evidence." *PCS Nitrogen*, 714 F.3d at 174.

Examples in other cases shed some light on what is required to accomplish such a transfer of liability for response costs. In cases where agreements were entered into pre-CERCLA, wide breadth is required. For example, a provision that Party A will hold Party B "harmless from any and every claim arising out of the use by Party B" of the premises was deemed sufficient to encompass CERCLA liability. *Dent*, 993 F. Supp. at 940. Similarly, language in an agreement that "Party A agrees to comply with all applicable Federal, State and local laws, ordinances, codes, rules and regulations and to indemnify Party B against all losses, damages and costs resulting from any failure of Party A to do so" was also sufficient to transfer CERCLA costs. *Jones-Hamilton Co. v. Kop-Coat, Inc*., 750 F. Supp. 1022, 1023 (N.D. Cal. 1990), *aff'd in part and rev'd in part on other grounds by Jones-Hamilton Co. v. Beazer Materials & Servs., Inc*., 973 F.2d 688 (9th Cir. 1992).

The court disagrees with ALC that Paragraph 5 clearly and unmistakably shifts financial responsibility for all CERCLA liabilities to Dixon. Instead, the court concludes that the terms of Dixon's and ALC's Agreements are not clear on this point. Here, of course, the Agreements were entered into post-CERCLA, yet there is no mention at all of CERCLA in Paragraph 5. Indeed, the paragraph references "laws enforceable by DEQ," which does not include CERCLA. *Superfund*, Va. Dep't of Envtl. Quality, https://www.deq.virginia.gov/Programs/LandProtectionRevitalization/RemediationProgram/Sup erfund.aspx (last visited Mar. 29, 2019) (explaining that the United States Environmental Protection Agency "administers the [CERCLA] program in Virginia," and DEQ "works closely with EPA to ensure state regulations are considered").

Furthermore, and perhaps most importantly, the provision does not include any form of the words "hold harmless" or "indemnify," and does not include any acceptance of liability or responsibility for anything, let alone the kind of broad language of "any and all claims" or "all losses, damages, and costs" found to be sufficient in the above-referenced cases. It simply says that ALC's activities will be "considered to be remedial actions on behalf of Dixon" and that ALC shall not be considered to be an "owner" or "operator" for purposes of laws and regulations "enforceable by" DEQ. While the intent of the provision *may* have to been to limit financial liability in some way, the provision certainly does not say that.

The court concludes that this provision is insufficient, standing alone, to transfer all CERCLA liability to Dixon. Indeed, the language here stands in stark contrast to that in a case relied upon by ALC, *Peoples Gas Light & Coke Co. v. Beazer East, Inc.*, 802 F.3d 876, 881 (7th Cir. 2015). (Dkt. No. 174 at 21.) There, the language expressly disclaimed "liability of any character" for Party A and stated that "expense of [the] operation" of the plant "shall be borne by Party B." *Id.* The court concluded that language was sufficient to transfer liability for costs. As is obvious, that is far broader than the language here, and unlike the language here, it expressly references both liability and expenses.

Even if the court were to consider extrinsic evidence to ascertain the parties' intent as to Paragraph 5, *see PCS Nitrogen*, 714 F.3d at 174, nothing to which ALC points convinces the court that the intention of the parties was to transfer all response costs for environmental liability under CERCLA to Dixon. Instead, it appears to the court that the parties did not definitively resolve who would bear what costs as part of their agreement. Documents from the same approximate time period as the 1993/1995 Agreement seem to reflect instead that the parties agreed to work together and did not explicitly address who would pay for what. An example of

this is the PER, incorporated by reference into Dixon's 1994 Consent Order with DEQ and clearly relied upon by all parties in structuring the work. The PER reflects that ALC was to perform much of the reclamation work (including removal of pipes as excavation progressed), and nothing clearly directs that the cost of that work (or any problems that occurred at the site during the course of that work, regardless of fault) would be borne by Dixon. In short, the court rejects ALC's contention that the parties' 1993/1995 Agreement shifted all CERCLA response costs to Dixon.

### 3. Dixon has proved its prima facie case for cost recovery from ALC.

Having rejected ALC's threshold argument, the court next addresses ALC's substantive arguments that it is not liable for any response costs at the site. To establish a prima facie case for cost recovery under 42 U.S.C. § 9607, a plaintiff must establish: (1) that the site in question is a "facility," as defined in 42 U.S.C. § 9601(9); (2) that the defendant is a potentially responsible party under 42 U.S.C. § 9607(a); (3) that a release or threatened release of a hazardous substance from the facility has occurred; and (4) that the release or threatened release has caused the plaintiff to incur response costs. *Pneumo Abex v. Bessemer & Lake Erie R.R. Co.*, 921 F. Supp. 336, 341 (E.D. Va. 1996). A party seeking contribution under § 9613(f) also bears the burden of proving each party's equitable share of response costs. *PCS Nitrogen, Inc.*, 714 F.3d at 185. Here, each party asserts a § 9613(f) claim against the other.

ALC has conceded that it is a potentially responsible party (PRP) under § 9607(a)(1) because it was an operator of the facility at the time that there were releases or threatened

releases;[19] it has likewise conceded that, as far as liability under subsection (a)(1) is concerned, Dixon can establish the first three elements of its case as listed above. (Dkt. No. 174 at 23–24.) Its challenge to liability under subsection (a)(1), then, focuses solely on the fourth element of Dixon's claim. Specifically, ALC argues that, apart from the DEQ fine, Dixon cannot establish that it has incurred any response costs as a result of any releases that have occurred at Austin Meadows during the period from 1993 to 2015, when ALC was an operator.[20]

Prior to trial, ALC argued that Dixon could not establish the fourth element of its claim because all response costs resulted from acts or omissions of Dixon and that ALC's operations did not cause any *additional* response costs. It argued that all monies Dixon has spent have served to implement a remediation plan that is the same plan DEQ required of Dixon in the 1994 Consent Order, which was in response to water quality violations caused by tailings *before* ALC was involved at Austin Meadows. That is, ALC argued that the reclamation plan required of Dixon under the 1994 Consent Order never changed and was the same plan implemented 20 years later in 2015.

There are cases, however, that clearly state that it is not necessary that the actions of a PRP actually cause or contribute to the response costs in order for element four to be established. One is *Allied Signal, Inc. v. Amcast Int'l Corp.*, 177 F. Supp. 2d 713, 749 (S.D. Ohio 2001), in

---

[19] A second possible basis for holding ALC liable as a potentially responsible party is pursuant to § 9607(a)(2) (sometimes referred to by ALC as "past operator" liability). In order for ALC to be liable under subsection (a)(2), there must have been a "disposal" during the time it was an operator, and not merely a "release" of a hazardous substance. (See Order, Dkt. No. 171 (noting the parties' agreement that "ALC is a potentially responsible party under 42 U.S.C. § 9607(a)(2) if Dixon can prove that, from 1996 to 2015, there was a disposal and not just mere passive contamination or migration.").) The parties disagree as to whether there was a "disposal" during Dixon's time as operator. Because the court concludes that Dixon has established ALC's liability under (a)(1), however, it does not address whether ALC also qualifies as a PRP under (a)(2).

[20] In its closing argument, ALC also acknowledges that the evidence at trial showed that there was at least one additional response cost—the $16,000 fine imposed by DEQ, only $15,000 of which was repaid through the increased royalty payments. (ALC Closing Arg. 10 n.5.)

which the court held that a CERCLA defendant cannot avoid liability "merely because the plaintiff would have incurred the same costs to remediate the site even if the defendant had not deposited hazardous substances therein." Additionally, there are a number of CERCLA cases from the Fourth Circuit that make clear that Dixon is not required to prove that its response costs are tied to a specific waste disposed of, or action taken, by ALC. *See, e.g.*, *Westfarm Assocs. Ltd.*, 66 F.3d 669, 681–82 (4th Cir. 1995); *United States v. Monsanto*, 858 F.2d 160, 170 n.7 (4th Cir. 1988) (noting that Congress declined to include a nexus requirement in CERCLA and expressly "eliminated the element of causation from the plaintiff's liability case").

In its closing argument, ALC seems to recognize this legal principle. Therein, instead of arguing that a case for liability has not been established due to no additional response costs, ALC relies on the lack of additional costs imposed by any post-1992 releases simply as one of the factors the court should consider in allocating costs. (ALC Closing Arg. 10–11, Dkt. No. 195.) Indeed, ALC cites to the district court's decision in *Dent* for the proposition that courts "have not imposed liability upon a [PRP] whose conduct has not caused any additional response costs." (ALC Closing Arg. 13 (citing *Dent*, 993 F. Supp. 923).) *Dent* held that, in determining the allocation of costs, the court would not impose costs on a party where its conduct did not result in additional response costs. *Dent* did not hold, however, that a plaintiff fails to establish a prima facie case under § 9607(a) unless there were additional or new response costs, nor did *Dent* suggest that there is any requirement that specific response costs be caused by any disposal or release by a PRP. In the same vein, the court here concludes that Dixon has incurred response costs during the time ALC was an operator and thus that there is at least the potential for a contribution claim against ALC, but it will consider the issue of causation or additional costs in the context of determining equitable allocation.

ALC's contention that Dixon has not incurred any response costs aside from the fine also ignores the fees Dixon has paid to Heath and to Faulkner to prepare reports pursuant to the LOA and the amounts Dixon has expended for water testing. (*See also* Pl. Ex. 205 (invoices).) These amounts do not relate solely to pre-1993 discharges. The LOA itself makes clear that the requirements are imposed as the result of new releases from Austin Meadows (Def. Ex. 22.), and Mann admitted that as part of the LOA, DEQ required testing at three more locations than had been required previously. (Day 3 Trial Tr. 96; *see also* Day 2 Trial Tr. 180 (Garner's testimony that, as part of the LOA, DEQ ordered additional engineering and more frequent water testing).)

For these reasons, then, the court concludes that ALC can be held liable to Dixon for CERCLA response costs under § 9607(a)(1).

Likewise, as to ALC's CERCLA counterclaim, Dixon does not dispute that it is at least subject to potential liability under § 9607(a). Instead, it argues that ALC cannot recover on its CERCLA claim because ALC has not incurred any response costs. (Dixon Closing Arg. 15–16.) For the reasons discussed below in addressing specific expenditures by ALC, the court disagrees.

### 4. The Austin Meadows facility includes Jackson Branch.

Before turning to the determination of equitable allocation, one additional legal issue requires resolution. Dixon argues that the CERCLA site at issue includes Jackson Branch and the repairs to Jackson Branch. ALC disputes this, emphasizing the apparently undisputed fact that the Jackson Branch pipe and dam have never been within the ALC mining permit

boundary.[21]  Accordingly, ALC contends that Jackson Branch is not within the site where ALC

was an operator and thus that it can bear no responsibility or liability for any discharges as a

result of the failed Jackson Branch pipe and dam.

The court agrees that there is no evidence that the Jackson Branch pipe or dam were ever

included in the mining permit boundary established by DMME.  *See supra* n. 16, 21.  But that is

not dispositive of the issue of whether the CERCLA site includes Jackson Branch.

CERCLA includes two definitions of a "facility," and the one most helpful here is set

forth in 42 U.S.C. § 9601(9)(B).  That provision defines the term "facility" as "any site or area

where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise

come to be located."  The scope of a CERCLA "facility" is based upon "the scope of response

actions, the [governmental authorities'] determination of what land is included in a facility,

where hazardous substances have been disposed of, and how the plaintiff defines the scope of the

facility in the complaint."  *Ashley II*, 791 F. Supp. 2d at 475–76; *see also United States v. Twp. of*

*Brighton*, 153 F.3d 307, 313 (6th Cir. 1998) (explaining that "an area that cannot be reasonably

or naturally divided into multiple parts or functional units should be defined as a single 'facility,'

even if it contains parts that are non-contaminated").

Here, those factors support a finding that the entirety of Austin Meadows, including

Jackson Branch, are part of the facility.  The scope of response actions certainly included both

Buddle Branch and Jackson Branch.  And as set forth in the LOA, to which DEQ and DMME

---

[21] Although ALC's closing argument emphasizes facts showing that the Jackson Branch repairs were outside the area of its mining permit (ALC Closing Arg. 20–21), the court does not believe that Dixon is disputing that permit boundary.  To the extent Dixon does dispute that, the court finds in favor of ALC on the issue of its permit boundaries.  The evidence at trial showed that when DMME ordered ALC to apply for an amendment of its permit in 2015 to add an area of disturbed land "near" Jackson Branch," that added area (.48 acres of land) was still approximately 50 yards from the Jackson Branch dam.  (Day 3 Trial Tr. 146–47; Def. Ex. 37.)  ALC flatly denies, and no evidence before the court shows, that it ever was required to, or did, add the Jackson Branch pond, pipe, or dam to its permit.

were both parties, the responses were clearly aimed at improving water quality downstream of both branches. Furthermore, DEQ believed "Austin Meadows" to include the entirety of the tailings pile and both streams. (Newman Dep. 118.)

The PER, which was drafted by ALC and was the originating document that led to ALC's involvement at the site, refers to both Buddle and Jackson Branches as being part of Austin Meadows, and does not carve out either one. (Day 1 Trial Tr. 74–75; Day 2 Trial Tr. 297–300; Pl. Ex. 147, under heading "Site Description".)[22] Also, the PER referenced that , as part of ALC's extraction procedure, "[f]abric filter fences will be erected to filter surface drainage before entry into the drain system." (Pl. Ex. 147, at 6.) The other two sentences in that same paragraph then go on to reference Jackson Branch and Buddle Branch. (*Id.*) Taken together, these sentences suggest that sediment control was important during ALC's operation, in order to prevent surface water from anywhere at Austin Meadows—which including Jackson Branch— from flowing onto the tailings pile. *See Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.*, 191 F.3d 409, 418 (4th Cir. 1999) ("Courts have uniformly refused to divide widely contaminated properties like the one at issue here into separate facilities in response to a party's claim to be responsible for contamination in only certain parts of the property."). Indeed, the interconnectedness of Jackson Branch, as it flows through Austin Meadows, to the tailings pile, is evidenced by the fact that the stream was at one time rerouted solely to go around the tailings pile and that part of the remediation effort included restoring it to its natural channel.

Furthermore, the scope of the facility in the complaint is not limited to the DMME permit

---

[22] Dixon relies heavily on the fact that ALC could have expanded its mining permit to include Jackson Branch, but did not. The court is not sure that this alone provides the "authority to control" that Dixon attributes to it. (Dixon Closing Arg. 3–6, Dkt. No. 196.) But it matters not. Austin Meadows, where ALC was an operator for more than two decades, and where ALC mined hazardous materials in close proximity to water sources that flowed downstream into a river, is the facility, and that facility includes both Jackson and Buddle Branches.

area, but includes more general references to Austin Meadows, with no exception made for Jackson Branch.  (Am. Compl. ¶ 5.)

5. **The proper allocation of response costs is that, with the exception of several categories of response costs sought, Dixon should bear eighty percent of response costs, and ALC should bear twenty percent.**

Having determined that both parties are liable for contribution from the other for response costs, and with the parties' agreement that the harm is indivisible,[23] the court must address the proper allocation of costs between them.  Each has paid some response costs to date. ALC identifies hauling costs in the amount of $370,315.00, which it incurred to move tailings off Dixon's property in 2014 and 2015 to meet the 2015 deadline.  ALC also has incurred significant costs, subsequent to that removal, in order to restore the property.  The following costs have been identified by ALC, none of which Dixon has paid for: (1)  Phase I and some of Phases II and III of Wright's Revised Plan, totaling $638,314 for work (Def. Ex. 47, 48); (2) Phase II in summer 2016, totaling $89,525 in costs (Def. Ex. 49); (3) a substantial amount, but not all, of Phases III and IV, in spring and summer of 2007, totaling $158,168 in costs.  (ALC Proposed Findings of Fact & Concl. of Law, ¶¶ 48–50, Dkt. No. 174 (citing Def. Exs. 47–50).)  In sum, ALC contends it has spent $886,010.15 as of October 27, 2017, which it seeks to recover from Dixon.  (ALC Closing Arg. 10, Dkt. No. 195 (citing Def. Exs. 47–50).)

Dixon's evidence of costs includes a number of invoices for work at Austin Meadows over the relevant period.  (Pl. Ex. 205.)  These include costs of repairing the Jackson Branch pipe and dam; costs of reseeding; costs of water quality testing; engineering consulting fees; fees billed by Faulkner; and travel expenses of Dixon personnel to and from Austin Meadows.  (Pl.

---

[23]  As noted above, the parties have agreed that the harm at the site is not divisible for purposes of apportionment of liability but may be divisible for purposes of allocating harm and determining contribution.  (Order 2, Dkt. No. 171.)

Ex. 205.)  Dixon also stated in its pretrial proposed findings that it has incurred costs of approximately $350,000 and is "at risk of incurrence of millions in future response costs."  (Dkt. No. 175 at 4.)

In determining how proper response costs should be allocated, the court weighs equitable factors, and those factors may include any that the court considers appropriate.  42 U.S.C. § 9613(f)(1); *Dent*, 993 F. Supp. at 949–50.  In this case, some of the relevant factors come from the so-called "Gore factors"[24] in allocating response costs.  Those factors are: (1) the relative contribution of the parties to the disposal or releases of hazardous materials; (2) the amount of hazardous material released; (3) the toxicity of the hazardous material released; (4) the degree of involvement of each party in the generation, transportation, treatment, storage, or disposal of hazardous materials; (5) the degree of care exercised by the parties with respect to the hazardous materials; and (6) the level of cooperation with Federal, State and local officials to protect the environment.  *Id.* at 950.  The court also considers other factors relevant here, such as the economic benefit to each party of the remediation efforts and contractual relationship, *see id.* at 951 (citing *Weyerhaeuser Co. v. Koppers Co.*, 771 F. Supp. 1420, 1427 (D. Md. 1991)), and "any contracts between [the parties] bearing on the subject," *United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 572 (6th Cir. 1991).  Rather than discussing each factor separately, however, the court weaves them into its discussion concerning the reasons for its allocation.

After consideration of the relevant factors, discussed in greater detail below, the court concludes that the equitable allocation of response costs is for Dixon to be responsible for eighty percent of most response costs and ALC to be responsible only for twenty percent.  The court

---

[24] The factors are named after Albert Gore, Jr., one of the sponsors of CERCLA.  *Alliedsignal, Inc. v. Amcast Int'l Corp.*, 177 F. Supp. 2d 713, 746 n.68 (S.D. Ohio 2001).

also addresses some specific costs, excluding some altogether and allocating others to one party or the other.

   *a. Dixon is properly allocated eighty percent of most response costs.*

Dixon is primarily responsible for the response costs, most notably because Dixon was the owner of the property. Once it entered into the Consent Order with DEQ, Dixon was responsible at least to DEQ for the remediation and reclamation of Austin Meadows. ALC entered into a contractual relationship with Dixon to assist Dixon and to benefit itself economically, but it had no obligation before doing so to remediate the site. Also—and critically—the court concludes that Dixon negligently failed to maintain the Jackson Branch pipes and dam, which led to the 2013 releases. The repairs for that area constitute a large amount of the response costs.

Additionally, there are a number of aspects about the parties' Agreements and their course of conduct during the project that suggest Dixon should be held responsible for the great majority of expenses. For example, the parties' Agreements, while not containing an indemnification provision for CERCLA response costs, clearly state that Dixon remains the "operator" and "owner" for remediation purposes. (Pl. Ex. 146.) Also, the LOA signed in 2014 has some bearing on the parties' decisions regarding financial responsibility. Specifically, Dixon agreed—and this agreement came after the 2013 releases—to a LOA including Exhibit 3, which seems to express that Dixon is financially responsible for most of the clean-up at the site. Again, even if Dixon felt pressured (and even if, by its terms, the LOA expired before all remediation was completed), Dixon nonetheless agreed to this plan, including the exhibit. This is some evidence that the parties believed Dixon was primarily responsible for all of the costs referenced

in Exhibit 3.  Similarly, the fact that Dixon paid for water testing for years, without complaint, suggests that Dixon believed that cost was its responsibility.

The relative financial benefit to the parties of the entire arrangement also favors allocating more to Dixon, but only slightly.  Had Dixon not hired ALC to remove the tailings, it would not have been paid royalties (which have amounted to approximately $150,000 so far), and it would have had to pay a significant amount of money to a non-mining entity to haul away the tailings.  At this point in the process, moreover, Dixon benefits from having—although it was essentially required to generate—a much cleaner, nicer piece of property with all (or nearly all) of the hazardous tailings pile gone.  On the other hand, ALC received gross proceeds of $5 million for the sale of tailings from the site, although that figure ignores the overhead and other expenses associated with the removal.  According to ALC, its net proceeds are far less, in the range of $1 million.  If ALC were to bear the entirety of the response costs, as Dixon suggests, ALC would have spent twenty years mining tailings for virtually no profit.

> b.  *ALC is properly allocated twenty percent of most response costs.*

The court also concludes, though, that ALC shares some responsibility for CERCLA response costs, although its obligation is far less than Dixon's.  Specifically, the court concludes that ALC should be responsible for twenty percent of the response costs, subject to certain exclusions.  ALC's responsibility is primarily due to its lengthy delays in removing the tailings, which it knew to be potentially dangerous to the site generally and to nearby waterways, and which it had an exclusive permit to mine.

To the extent ALC contends it had no obligation to remove the tailings at all, that it had no obligation to do so in any particular time frame, and that it could have terminated the agreement at any time or decided it was not commercially viable and stopped removing tailings,

those arguments are all contrary to the terms of the agreement. First of all, Paragraph 3 says that ALC "shall remove," using mandatory language. It lists a period of "not to exceed." The parties' course of conduct, as well as letters from ALC to the DEQ acknowledging its slow pace, also support that ALC felt obligated to remove the tailings in the time set forth in the agreement.

Additionally, the fact that the "manner" of removal was subject to direction by DEQ belies any suggestion that ALC was not beholden to anyone to remove the tailings. The DEQ's documents throughout the entire course of this project suggest that they believed the tailings should be removed in a reasonable time-frame. With regard to ALC's alleged ability to terminate the agreement, that fact is largely irrelevant when considering the equities, given that it never attempted to do so but instead entered into renewed agreements with extended time frames for removal. In short, the significant delays in removal—regardless of the reasons and regardless of whether they constituted a breach of its contractual obligations to Dixon—clearly played a role in creating response costs, and those delays cannot be attributed in any way to Dixon.

While the conditions at Austin Meadows certainly impacted the speed of removal, the court finds that ALC repeatedly made commitments to increase the tons it would remove from Austin Meadows, but then failed to do so, and that the reasons it gave for the very low numbers of tonnage were not always believable. Instead, the court finds that the primary reason ALC mined Austin Meadows relatively slowly was because Bunker Hill was more profitable. As Dixon repeatedly emphasized, had the tailings been completely removed from the property at any point prior to 2013, which was twenty years after the initial Agreement and more than a decade later than estimated in the PER that ALC drafted, then there would not have been any tailings on the property to get discharged into the streams when the Jackson Branch pipe and dam broke. In sum, ALC's slow pace of removal and the fact that one or more stockpiles—

albeit not strictly permanent—were left on-site from 1996 through 2014,[25] all contributed to the problems on the site and the discharges of pollutants in 2013 and later.

The court concludes that ALC should pay a portion of the response costs also because of inaccuracies or misrepresentations it included in the PER that was relied upon by Dixon and by the government agencies.  ALC had superior knowledge, relative to Dixon, of the contaminants and how to deal with them, ALC held itself out as offering a viable solution (one that benefitted itself financially), and then it dragged its feet on the removal of the hazardous substances.  Also significant to the court is that ALC was responsible for some reclamation under its mining permit regardless of Dixon's obligations, although this would not have included the response costs required to repair the Jackson Branch pipe, for example, which was outside of ALC's permitted area.

ALC's recognition that it bears some responsibility for costs is also reflected in ALC's decision to pay Dixon back for the $16,000 fine and in Mann's letter to DEQ acknowledging ALC's failings as a remediation contractor.  As to the fine, despite Mann's insistence that ALC agreed to pay Dixon back because it was the "right" thing to do (Day 1 Trial Tr. 142, 186), the slow pace of removal that caused Dixon to incur the fine was certainly inconsistent with the way the parties envisioned the project proceeding.

As to the exclusivity of ALC's permit, which Dixon repeatedly notes as a factor in its favor, that is only a very minor consideration in the court's view.  Dixon emphasizes that,

---

[25]  Dixon emphasizes that the DMME permit states that there will be no "permanent" stockpiles of tailings at Austin Meadows, basing its contention on Mann's admission that ALC had one or more stockpiles on the property from 1996 through 2014.  (Day 1 Trial Tr. 85–86.)  That is, the limestone that ALC excavated from Austin Meadows was moved to temporary stockpiles elsewhere on the Austin Meadows site, and when customers came to purchase limestone, their purchases would be loaded from the stockpile site at Austin Meadows by ALC.  Stockpiles were built and depleted and then depleted again.  Thus, while the location and size of the stockpiles varied, there was a limestone stockpile maintained at Austin Meadows by ALC from 1996 through 2014.  (Day 1 Trial Tr. 85–86, 99–101.)

because ALC had the exclusive right to remove tailings at Austin Meadows as a DMME permit holder, Dixon had no ability to hire its own contractor or to remove ALC from the job. But DMME allows a permit holder (here, ALC) to assign its permit to another permitee. (Day 1 Trial Tr. 213.) And while true that Dixon could not *require* ALC to reassign its permit (Day 1 Trial Tr. 252–53), there is no evidence that Dixon ever sought to try to remove ALC from its job or to hire another entity to do the removal. Moreover, there was some testimony from DMME employee Skorupa that if the material had simply been removed and hauled elsewhere, but not for commercial gain (*i.e.*, not sold), then a permit may not have been required. Crediting that testimony, Dixon may have been able to have the material hauled away (but not sold for profit) despite the exclusive mining permit. For these reasons, the court considers this factor as only minimally impacting its allocation calculus.

The court also notes that part of ALC's responsibility (although not a large part) comes from ALC's actions in failing to protect the Austin Meadows stockpiles once the tailings were excavated because the failure to protect shows a lessened degree of care by ALC in dealing with the tailings. Specifically, despite references in the PER to ALC using "fabric filter fences," ALC admits that the stockpiles at Austin Meadows were not tarped, did not have fabric filter fences around them, and were open to wind and weather. (Day 1 Trial Tr. 86.) Dixon's expert, Faulkner, testified that had the stockpiles been better protected, that protection could have prevented or lessened discharge problems resulting from the 2013 Jackson Branch leakage, and the court credits that testimony. (Day 2 Trial Tr. 153–55.) On the other hand, as Mann pointed out, those erosion and sediment control measures were not required by ALC's mining permit or directly by the parties' Agreements, and he testified to a downside of such measures, in that they would have prevented the limestone tailings from drying out further, which was what needed to

occur for them to be removed. This is especially so because the drying time at Austin Meadows was already much longer than for Bunker Hill because the tailings there were finer. (Day 1 Trial Tr. 212–213.) In sum, the lack of stockpile protection plays a slight role in the court's analysis.

     *c. Allocation or exclusion of specific costs*

Turning to specific alleged response costs, the parties have disputed certain costs, and the court concludes that equity demands some exceptions to the court's general allocation rule. In particular, as discussed next, the court excludes from this percentage allocation several costs and, as to others, concludes that the financial burden for those costs should be entirely on one party or the other.

     **i.  Repairs to the Jackson Branch pipe and dam, related engineering fees, and costs of water quality testing are all expenses properly included as response costs and allocated according to the primary allocation.**

There are several categories of expenses to which one party or the other has objected, claiming that they are not properly included. The court addresses these objections briefly.

First of all, the court concludes, for the reasons already discussed, that repairs to the Jackson Branch pipe and dam are properly considered part of the response costs at the facility where ALC was an operator. They should be divided according to the primary allocation.

Likewise, although the cost of water testing was borne by Dixon for much of the parties' working relationship, the court concludes that water testing from June 2013 through DMME's approval of ALC's reclamation should be included as a response cost and divided according to the primary allocation. DEQ initially required that testing of Dixon, but ALC entered into the LOA after the Jackson Branch failures, and that also required water testing and, indeed, additional water testing. Most importantly, much of the required water testing after June 2013 was the direct result of the releases on the site, for which both parties are partially responsible.

Thus, water testing costs from June 1, 2013, through the completion of ALC's obligations of reclamation, as determined by DMME, should be divided according to the primary allocation. After DMME concludes that ALC's reclamation obligations are complete, any future water testing costs related only to Austin Meadows shall be borne solely by Dixon.

The court also concludes that fees paid to Heath that have been borne by Dixon are proper response costs. Both parties hired Heath, and his services were engaged in large part to respond to the 2013 releases. Both parties were obligated under the LOA to obtain some of the services he provided. Based on Garner's testimony, it appears that at least some of these costs have been shared to date. (Day 2 Trial Tr. 247; *see also id.* at 246.) In any event, these costs should be divided according to the primary allocation.

### ii. Re-seeding and re-vegetation expenses must be borne entirely by Dixon.

As both parties admit, the parties clearly contemplated that Dixon would be financially responsible for reseeding (Day 2 Trial Tr. 173), despite the fact that reseeding is a response cost at the site. Thus, the court does not include re-seeding and re-vegetation expenses as part of the equitable allocation, but instead determines they should be borne by Dixon.

### iii. Hauling costs incurred by ALC must be borne entirely by ALC.

The court excludes from its overall allocation of response costs the hauling costs (approximately $350,000) that ALC incurred in 2014 and 2015. "Removal" of the tailings from the property was something that ALC agreed to do and failed to do in a reasonably timely fashion. While true that Dixon would have had to pay someone else to remove the tailings had ALC not done so, the entire point of the remediation arrangement between the parties was that ALC would *remove* the tailings. ALC alone should bear the hauling costs.

**iv. Post-dispute Faulkner services to Dixon must be borne entirely by Dixon.**

Similarly, Dixon cannot recover for any amounts spent on Faulkner for services provided *after* January 9, 2015, when Dixon elected not to cooperate with ALC and pursue its own plan. (Day 2 Trial Tr. 253 (explaining that Dixon is seeking contribution for all of Faulkner's fees), Day 2 Trial Tr. 295–96 (explaining that Dixon is not seeking to recover for any fees from Faulkner incurred as part of the litigation).)  At that point, it was clear that an open stream channel would be required, and Dixon's actions forced ALC to obtain its own evaluator for the site.  Thus, it was not reasonable to continue to pay for Faulkner and press for his proposed plan. Thus, that cost should be borne by Dixon alone.

**v. Dixon's attorneys' fees are not a response cost.**

Attorneys' fees can be recoverable in a CERCLA contribution action, but only if they are closely tied to the actual cleanup of the contaminated site.  Fees incurred to bring CERCLA litigation or to negotiate with regulatory agencies, for example, are not recoverable.  *Key Tronic Corp. v. U.S.*, 511 U.S. 809, 820 (1994).  Likewise, they are not recoverable if the attorneys' work was "primarily" done to "protect" the party's interests.  *Id.*  But if fees are "closely tied to the actual cleanup," they may "constitute a necessary cost of response" and be recoverable.  *Id.*

At least one district court within the Fourth Circuit has defined the circumstances under which attorney's fees could be included as a response cost as "highly limited."  *Mercury Mall Assocs., Inc. v. Nick's Market, Inc.*, 342 F. Supp. 2d 515, 530–31 (E.D. Va. 2004) (noting the possibility of attorneys' fees as a response cost and so denying a motion to dismiss them, but also their limited availability).  In keeping with the narrow construction of fees as response costs, another court has reasoned that where the attorneys' fees might aid the cleanup but were primarily aimed at protecting the party's own interests, they are not recoverable as response

costs.  *See, e.g.*, *Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.*, No. 2:05-cv-2782-MBS, 2011 WL 2119234, at *20 (D.S.C. May 27, 2011), *aff'd*, 714 F.3d 161 (4th Cir. 2013) (declining to include attorneys' fees as response costs because they effectively served no purpose other than the reallocation of costs).  In the one case cited by Dixon on this issue, where a portion of fees were allowed as a response cost, *Pneumo Abex Corp.*, 936 F. Supp. at 1262, there were detailed billing records submitted, and the court combed through them to allow a limited portion as response costs.  (*See* Dixon Closing Argument ¶¶ 13–14, Dkt. No. 196.)

In this case, Dixon's attorneys were certainly involved during the time period of the cleanup of the site, but their actions seem directed at negotiating with agencies and protecting Dixon's interests vis-à-vis ALC, the very types of fees that the Supreme Court has said are not recoverable as a response cost.  *See Key Tronic*, 511 U.S. 809, 820.  Dixon has not met its burden of showing that attorneys' fees are properly included as a response cost, and they are therefore excluded.

### vi.  Dixon's travel expenses must be borne entirely by Dixon.

Dixon also seeks travel expenses for its employees' travel to and from the site (primarily mileage), and Exhibit 205 includes some time sheets, mostly for Mr. Baxley's time spent at the site, at least since 2013.  Neither the exhibits in support of those expenses nor Garner's testimony provided much detail as to the purpose of the visits, however.  (Day 2 Trial Tr. 249–251.)  Garner testified that on the dates referenced, Baxley was doing "various things": "checking on the situation," spending time on the "pipe failure," attending meetings with DEQ and Akers to discuss issues about tailings removal, and "supervis[ing] the seeding."  It seems to the court that at least some of them—much like the attorneys' fees—were likely for the purpose of protecting Dixon's interests, rather than in responding to releases at the site.  But the records are not

detailed enough for the court to determine this either way. Additionally, neither party cites any law that provides any guidance on the issue. In view of the fact that Dixon has borne the costs thus far, and the burden is on it to show that contribution should be made by ALC, the court concludes that Dixon has not met its burden. The court thus concludes that Dixon's time and travel expenses shall be borne solely by Dixon.

*   *   *

To summarize, the court concludes that the proper allocation of response costs should be divided such that Dixon is responsible for eighty percent of them and ALC is responsible for twenty percent, subject to the exceptions set forth above: hauling, which is to be borne entirely by ALC; and Dixon's attorneys' fees, Dixon's travel expenses, re-seeding and re-vegetation expenses, and any Faulkner services for expenses incurred after January 9, 2015, which are to be borne entirely by Dixon.

## 6. Future response costs

As to future costs, the court concludes that it is not appropriate to continue to apportion liability to ALC now that it has completed removal of the tailings and has begun (if not finished by now) the reclamation required by DMME. Accordingly, the response costs (subject to the exceptions set forth above) incurred by either party from the time of trial through the date that DMME determines that ALC's reclamation obligations have concluded are to be divided according to the court's primary allocation, eighty percent to Dixon, and twenty percent to ALC, subject to the same exceptions. For any costs incurred after that date, ALC shall bear no financial responsibility to Dixon for response costs at Austin Meadows.

### 7. ALC's state law claims

ALC asserts two other state law claims in its counterclaim. The parties (both in their proposed findings of fact and conclusions of law and in their written closing arguments) wholly fail to address or brief the breach of contract claim or the quantum meruit claim as separate claims. ALC notes that its counterclaim includes those claims. (ALC Closing Arg. 1, Dkt. No. 195.) But it focuses on the parties' various agreements only as one of the factors that the court should consider in allocating response costs, which the court has done. Likewise, ALC references quantum meruit only as a factor to be considered under the contribution statute. (ALC's Proposed Findings of Fact & Concl. of Law 33, Dkt. No. 174; ALC's Closing Arg. 19.) Based on these failures, the court deems both claims abandoned and will dismiss them. *See Airfacts, Inc. v. de Amezaga*, 909 F.3d 84, 91–94 (4th Cir. 2018) (explaining that whether or not a claim was abandoned is a "primarily factual finding" and noting that one important consideration in determining whether a claim has been unambiguously abandoned is whether the claim was briefed or argued before the trial court).

In *Airfacts*, the court concluded that a party had not unambiguously abandoned a claim simply by failing to address it in its closing, because the claim had been "consistently pursued throughout," *id.* at 93. In particular, the party had outlined the contentions underlying the claim in a joint pretrial order, expressly stated it was not abandoning issues set forth in its pleading, and reviewed the factual support for the claim in its factual summary at closing. *Id.* at 92.

Here, by contrast, ALC did not present or argue either of its state law claims in its opening statement, its proposed findings of fact and conclusions or law, or its written closing argument, nor did it make any attempt to show how the facts adduced at trial supported either claim. The court concludes that this is sufficient to deem both claims abandoned. *Cf. id.*

Even if not abandoned, the breach of contract claim is premised entirely on ALC's position that all of its agreements with Dixon obligated Dixon to be responsible for "final reclamation of the Site, including, but not limited to, re-vegetation, permanent erosion control and re-establishing stream channels." (Counterclaim ¶¶ 41–45.) For the reasons already discussed above, the court does not interpret the parties' agreements the way that ALC does. As noted, the court believes that the earliest agreements are either wholly or mostly silent on the issue of who is to bear which costs. Exhibit 3 to the 2013 LOA does divide costs more clearly and apportions many of them to Dixon, but there are still some costs that are not clearly apportioned. The court has considered the contractual provisions and the agreements of the parties, however, in allocating response costs. Additionally, the parties have not argued or briefed any of the other material issues that are possibly relevant to ALC's contract claim. These include, for example, whether ALC itself first materially breached one of the contracts, which would relieve Dixon of all continuing obligations under that contract. *See Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997).

Similarly, as to the quantum meruit claim, the court notes—and again, setting aside any preliminary legal issues or affirmative defenses that might preclude it altogether—that the claim is based in large part on equitable considerations. *See Schmidt v. Household Fin. Corp.*, 661 S.E.2d 834, 838 (Va. 2008) (explaining that a plaintiff may recover in quantum meruit if it shows the defendant's knowledge of the benefit and the defendant's acceptance or retention of the benefit under circumstances that render it inequitable to retain the benefit without paying for its value). From an equitable perspective, even if the court were to award relief on this claim, it would award ALC the same amount that it has allocated as between the parties under the

CERCLA claims discussed above. Thus, and to the extent it has not been abandoned, the court does not address that claim further.

## IV.   CONCLUSION

For the foregoing reasons, each party will be granted relief on their respective CERCLA claims. ALC's breach of contract and quantum meruit claims will be DISMISSED. An appropriate order and judgment will be entered.

Entered: March 31, 2019.


/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge